Victor Valles SALGADO, et
al., Plaintiffs,

v.

PIEDMONT CAPITAL CORPORATION,
et al., Defendants.

Civ. No. 77–826.

United States District Court,
D. Puerto Rico.

Dec. 30, 1981.

Harvey B. Nachman, Eduardo Morales Coll, Santurce, P. R., for plaintiffs.

Woods & Woods, Santurce, P. R., Robert N. Baker, Baker & Quinn, Los Angeles, Cal., Rafael Perez Bachs, McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz Suria, San Juan, P. R., O'Neill & Borges, Hato Rey, P. R., for defendants.

## OPINION AND ORDER

PEREZ-GIMENEZ, District Judge.

Plaintiffs seek to maintain this action both in their individual capacities and on behalf of a putative class under F.R.C.P. 23 for alleged fraud in connection with the sale of an investment program by defendants. Defendants move for summary judgment on the grounds that the plaintiffs' federal securities law claims and certain commonwealth claims are barred by the applicable statutes of limitation.

The Court finds that plaintiffs have failed to set forth specific facts showing there is a genuine issue for trial as required by F.R.C.P. 56(e). The Court further finds there is no triable issue of fact with respect of defendants' statute of limitations defense to the federal securities law claims; those claims are barred by the applicable statute of limitations and summary judgment must be entered in favor of defendants. Accordingly, the commonwealth claims must also be dismissed for want of pendent jurisdiction.

*Prior Proceedings*

This suit was commenced on June 1, 1977, by the filing of the original complaint. Prior to defendants' motion for summary judgment, the breadth of this action was narrowed by defendants' motion to dismiss.

Defendants first moved to dismiss the original complaint pursuant to F.R.C.P. 9(b) and 12(b)(6). Plaintiffs responded with an amended complaint, dated April 4, 1978. Defendants then moved to dismiss the amended complaint. On June 6, 1978, the Court granted that motion in part and dismissed plaintiffs' claims under Sections 5, 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. 77e, 77*l*(1), (2) (1976) (the "1933 Act"); under the Investment Company Act of 1940, 15 U.S.C. 80a–1, *et seq.* (1976); and under the Investment Companies Act of Puerto Rico, 10 L.P.R.A. 661 *et seq.* (1978). *Valles Salgado v. Piedmont Capital Corp.*, 452 F.Supp. 853 (D.P.R., 1978). On defendants' motion for reconsideration, by Order filed August 2, 1978, the Court also dismissed plaintiffs' claim under Section 11 of the 1933 Act, 15 U.S.C. 77k (1976).

Two federal securities law claims remain. The Court, in its June 6, 1978, Opinion and Order, held that plaintiffs had stated causes of actions under Section 17(a) of the 1933 Act and under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j (1976) (the "1934 Act"), and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder.[1] In addition, four substantive claims for relief under Puerto Rico law survived the motion to dismiss. Those claims are based upon the same allegations as the federal claims.

Prior to the determination of defendants' motion to dismiss the amended complaint, a pre-trial schedule was established by Magistrate Simonpietri to govern the discovery regarding the hearing and determination of whether this case should proceed as a class action. On November 14, 1977, the Magistrate ordered that "(t)he parties will see that strict compliance with the approved time table occurs.". That time table required that "(p)laintiffs' motion for a class determination ... be served not later than fifteen (15) working days after the completion of ... discovery" on the class determination issue.

Defendants took discovery concerning the class determination issues, including depositions of each of the remaining named plaintiffs, interrogatories and requests for pro-

---

1. Although plaintiffs have purported to state separate causes of action under Section 10(b) of the 1934 Act (Count Two) and Rule 10b–5 (Count Four), Rule 10b–5 does not itself create any right above and beyond those provided by Congress in the 1934 Act. *E.g., Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). As this Court recognized, moreover, Section 10(b) protects "in essence the same interest and right protected by ... Section 17(a) of the 1933 Act.". *Valles Salgado v. Piedmont Capital Corp.*, 452 F.Supp. 853, 858 (D.P.R., 1978); *see id.* at n.8.

The First Circuit has not yet specifically addressed the issue of whether to imply a private right of action under Section 17(a). Although this Court observed that it had "apparently *sub silentio*, recognized such a cause of action", *Valles Salgado*, 452 F.Supp., at 857, in reliance on *Cook v. Avien, Inc.*, 573 F.2d 685, 698 n.30 (1 Cir., 1978), other courts in the First Circuit, after express consideration, have concluded no private right exists. *Manchester Bank v. Connecticut Bank and Trust Co.*, 497 F.Supp. 1304

(D.N.H., 1980) *Dyer v. Eastern Trust & Banking Co.*, 336 F.Supp. 890, 901, 903 (D.Me., 1971). *See also, Woods v. Homes and Structures of Pittsburg, Kansas*, 489 F.Supp. 1270, 1284–88 (D.Kan., 1980), where the court reviewed conflicting authorities and concluded no private right of action exists. The Supreme Court has not yet resolved the issue. *Aaron v. SEC*, 446 U.S. 680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980).

The language of Rule 10b–5, which implements Section 10(b) of the 1934 Act, is virtually identical to that of Section 17(a) of the 1933 Act. The principal difference between Section 10(b) and Section 17(a) is that Section 17(a) applies only to offers and sales, while Section 10(b) and Rule 10b–5 apply to purchases, as well as sales, of securities. Because both the Section 17(a) and Section 10(b) claims in this action are based on the same alleged oral misrepresentations and omissions in connection with the sale of a security, and both are barred by the same statute of limitations, they are discussed together. It is unnecessary to further consider whether a private cause of action exists under Section 17(a).

duction of documents.[2] Plaintiffs sought no discovery either in connection with the class determination issues or defendants' motion for summary judgment. Although discovery was completed on or about July 3, 1980, plaintiffs did not move for a class determination as required by the Magistrate's Order.

Defendants thereafter brought on the instant motion for summary judgment, or in the alternative for an order that this suit not proceed as a class action.

## I.

### Findings of Fact

#### A. The Defendants

Defendants Piedmont Capital Corporation (Piedmont Capital), Piedmont Management Company, Inc. (Piedmont Management), and Piedmont Funding Corporation (Piedmont Funding), at all times material herein, were corporations organized under the laws of Delaware, with their principal places of business in California.

Defendant Pacific Fidelity Life Insurance Company (Pacific Fidelity), at all times material herein, was a corporation organized under the laws of California, with its principal place of business also in California.

Defendant Lexington Management Corporation, at all times material herein, was a corporation organized under the laws of Delaware, with a place of business in California, and was an investment advisor, as defined under the provisions of the Investment Company Act of 1940, 15 U.S.C. 80a–1 through 80a–64, and the Investment Advisers Act of 1940, 15 U.S.C. 80b–1 through 80b–21.

Defendants Lexington Research Fund, Inc., Lexington Growth Fund, Inc., and Lexington Income Fund, Inc., at all times material herein, were investment companies registered under the Investment Company Act of 1940, for whom Lexington Management Corporation served as an investment advisor. Lexington Growth Fund, Inc., and Lexington Income Fund, Inc., were organized under the laws of Maryland and had their principal places of business in New Jersey. Lexington Research Fund, Inc., was organized under the laws of the State of New Jersey, and had its principal place of business there.

Piedmont Management was the sole shareholder of Piedmont Capital, Piedmont Funding, Pacific Fidelity, and Lexington Management Corporation.

#### B. The Investment Program

The security that is the subject of plaintiffs' claims is the Piedmont Funding Investment Program. It was first offered for sale in the early 1970's. The Program was registered under the federal securities laws and a prospectus for the Program was provided to each investor.

Under the Program, mutual fund shares were used as collateral for loans to pay premiums on the investor's life insurance policies. Investors with pre-existing whole life policies borrowed against the cash value of those policies and used the proceeds to purchase mutual fund shares. In some cases the preexisting insurance policies were also placed on "minimum deposit", which meant that the insureds paid only that portion of the regular premium necessary to keep in effect the "risk portion" of the policy. With their policies on minimum deposit, the insureds continued to have the same amount of insurance coverage under their existing policies, but without further buildup of cash values in those policies. The money saved over time on reduced premium payments was used to buy additional mutual fund shares in connection with the Piedmont Funding Investment Program.

The mutual fund shares thus purchased, together with any existing shares already owned, would be used as collateral for loans from Piedmont Funding to the investor. The loan proceeds were used to pay the premiums on new life insurance policies

---

**2.** Pursuant to F.R.C.P. 37(d) plaintiffs Humberto Calvani Curet and Raúl T. Justiano were dismissed with prejudice, without objection, after their failure to appear for their depositions, by Order dated March 26, 1980.

taken out for the investor's benefit, usually with Pacific Fidelity. There was no requirement that any particular mutual fund's shares be purchased, and the investor was free to use shares already owned.

As annual premium payments on the life insurance policy became due, the size of the loan balance with Piedmont Funding would be increased by the amount of the new premium plus interest on the loan. These additional loans were to be collateralized by the value of mutual fund shares purchased over time by the investor and/or by any increase in the market value of shares already pledged. At no time was the total value of the pledged shares to be less than 150 percent of the amount of the outstanding loan balance. The entire accumulated loan balance was to be repaid at the time the investment program was terminated.

Using the cash values of existing policies and the amounts saved by placing those policies on minimum deposit, it was the goal of the Program to allow investors to obtain greater life insurance coverage and to enable them to purchase mutual fund shares that, it was hoped, would increase in value over time. The assumption that the mutual fund shares selected by the investors would continue to increase in value as they had in previous years was the fundamental premise upon which the success of the Program rested.[3]

On June 1, 1975, the programs were effectively terminated when Piedmont Funding determined that it would no longer make loans to participants to finance the payment of insurance premiums (e.g., Mark Ex. 25). The principal consequences to the investors was that they were required to

pay off their outstanding loan balances to Piedmont Funding.[4]

### C. The Representative Plaintiffs

Dr. Víctor Valles Salgado is a physician who has practiced in Puerto Rico since 1958 (Valles Salgado, Tr. 7–8). Prior to the time he purchased the Piedmont Funding Investment Program, he was experienced in mutual fund investments (id. Tr. 23–26). Dr. Valles Salgado agreed in June 1971 to purchase the Investment Program, and did so in September 1971 (see Valles Salgado Tr. 42, 56, 58, and Ex. 5).

Dr. Anthony J. Mark is an ophthalmologist who has practiced in Puerto Rico since 1960 (Mark Tr. 7). Prior to the time he purchased the Piedmont Funding Investment Program, he too was experienced in mutual fund investments (id., Tr. 9). Dr. Mark purchased the Investment Program in March 1972 (id., Tr. 20–22, 32).

Dr. Frederick González, an anesthesiologist, had practiced in Puerto Rico since 1947 and like the others, prior to the time he purchased the Piedmont Funding Investment Program, was experienced in mutual fund investments. Dr. González purchased the Investment Program in April 1972 (González Tr. 13, 21, 23).

### D. The Alleged Fraud

Distilled to its essence, the amended complaint alleges three misrepresentations in connection with the sale of the Program:

(1) that life insurance premiums would be paid through the investment program "without plaintiffs having to disburse any money" (amended complaint, par. 22);

---

**3.** This assumption, and the possibility that it might not be realized, was clearly stated in the prospectus:

"*Growth Assumption.* In order to offset the charges a Participant incurs in a Program, his mutual fund investment together with reinvested dividends and capital gains distributions must experience growth, at least equal to such charges. There is, of course, no assurance that any mutual fund investment will do so."

(Valles Salgado Ex. 4; Mark Ex. 3; González Ex. 2, p. 7).

References to "_____ tr. _____" are to the depositions of the representative plaintiffs. References to "_____ Ex. _____" are to the exhibits to those depositions.

**4.** Recognizing that some investors might require time to repay the loans or find alternative source of funds, Piedmont Funding allowed persons who wished to do so to stretch out the payment over a one-year period (*i.e.*, June 1975–June 1976). Two of the representative plaintiffs accepted this offer (González Tr. 61–62; Mark Tr. 74).

(2) that plaintiffs "were purchasing a ten (10) year investment program" (*id.*, par. 25); and

(3) that the interest rates on the money borrowed to purchase life insurance or to pay annual premiums "would never exceed eight and one-half percent (8½%)" (*id.*, par. 28).

The amended complaint further alleges that the plaintiffs "did not know nor had they reason to believe, that said statements were untru..." (*id.*, par. 38; *see id.*, par 54). It is claimed that plaintiffs did not know of the alleged misrepresentations until after they received letter dated June 1, 1975, terminating their Programs (*id.*, par 73).

The remaining five commonwealth claims are based upon the Civil Code of Puerto Rico or upon statutes promulgated by the Commonwealth of Puerto Rico. Each of the four substantive claims incorporates the fraud allegations of the federal claims set forth in paragraphs 22 through 45 of the amended complaint.

Claims five, six and seven, respectively, rely on fraud in connection with: fulfilling contractual obligations (31 L.P.R.A. 3018) (amended complaint, pars. 76–84); fraudulently inducing plaintiffs to enter into a contract (31 L.P.R.A. 3408, 3511, and 3514) (amended complaint, pars. 85–90); and violation of an agency agreement "by committing fraud and deceit upon plaintiffs" (31 L.P.R.A. 4441, 4443, and 4447) (amended complaint, pars. 91–95). The eighth claim asserts defendants violated the Uniform Securities Act as adopted by the Commonwealth of Puerto Rico, 10 L.P.R.A. 851 through 895, inclusive.

The tenth claim is based upon the assumption that plaintiffs have prevailed on one or more of their prior claims. It alleges violation of 32 L.P.R.A., App. II, Rules of Civil Procedure of Puerto Rico, Rule 44.4(d) and avers that defendants as obstinate losing parties are obligated to pay reasonable attorneys' fees.

The amended complaint alleges not only that plaintiffs were defrauded into entering the investment programs, but also that, even after June 1, 1975, when loans to plaintiffs were not renewed and the Program thus terminated, a "sales presentation format" was used that resulted in some unspecified "compounding [of] the deception and the fraud" (amended complaint, par. 35; *see id.*, pars. 55, 74).

Concerning damages, the amended complaint avers that the plaintiffs "had to make considerable disbursements out of their pockets to pay for their insurance policies, [and] have lost the consideration they paid for the security, the cash value of their pre-existing life insurance policies, the interest from the date of acquisition of the securities, damages and attorney's fees." (*id.*, par. 41). In addition, in their responses to Interrogatories Nos. 11 and 12, all three plaintiffs claimed they were further damaged by the economic strain of meeting other existing investment commitments, being unable to pursue new investment opportunities, and by general impairment of their credit.

The Court further finds, for reasons hereinafter discussed, that: none of the representative plaintiffs was ever informed that the interest rate on premium payment loans extended to them by Piedmont Funding would not exceed 8½ percent; no representative plaintiff ever paid or was asked to pay an interest rate greater than 8½ percent; the Piedmont Funding Investment Program was terminated as of June 1, 1975, when Piedmont Funding determined not to make further premium loans; the allegations of misrepresentations after June 1, 1975, are contradicted by plaintiffs' own testimony; and none of the representative plaintiffs took any action after June 1, 1975, in reliance on any allegedly untrue representation by any representative of any of the defendants.

The Court further finds that each of the representative plaintiffs, prior to June 1, 1975, were required to, and did, make payments of cash and/or additional pledges of mutual fund shares to maintain the collateral balances required on their premium payment loans with Piedmont Funding. In

particular, Dr. Valles Salgado made a payment of $1,410 in August 1972; Dr. González made payments throughout the program; and Dr. Mark made a payment of $1,500 on February 11, 1974. Each knew that such additional payments would be required long before termination of the program on June 1, 1975, and more than two years before the filing of this action.

Finally, for the reasons discussed herein the Court finds that each plaintiff knew or, through the exercise of reasonable diligence should have known, more than two years before commencement of this motion, that the Piedmont Funding Investment Program was terminable by defendants in less than ten years.

## II.

### Conclusions of Law

#### A. Jurisdiction

The Court has jurisdiction over the federal claims under Section 22 of the 1933 Act, 15 U.S.C. 77v and Section 27 of the 1934 Act, 15 U.S.C. 78aa. Jurisdiction over the commonwealth claims, plaintiffs allege, is conferred by this Court's pendent jurisdiction and diversity jurisdiction, 28 U.S.C. 1332 (amended complaint, par. 20).

■ The diversity basis for jurisdiction is defective. It fails to meet the jurisdictional amount. The amended complaint does contain a conclusory allegation that the class has been damaged in an amount in excess of the $10,000.00. There is, however, no allegation as to the claimed damage to each plaintiff, neither class representative nor class member.

Damages may not be aggregated to meet the jurisdictional minimum. *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). *See also Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). The deficiency in plaintiff's jurisdictional allegation was brought to plaintiffs' attention in the motion against their original pleading. Plaintiffs' failure in the amended pleading to cure that defect makes further consideration unnecessary.

The only basis for jurisdiction over the commonwealth claims is pendent. If the federal claims fail, so must the commonwealth claims. *See, e.g., United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Rice v. The President and Fellows of Harvard College,* (1 Cir., 1981) 663 F.2d 336, at 339; *Robinson v. Stanley Home Products, Inc.,* 272 F.2d 601 (1 Cir., 1959).

#### B. F.R.C.P. 56(e)

Defendants seek summary judgment on the ground there is no triable issue of fact concerning when plaintiffs knew or should have known of the alleged fraud, and that such claims are barred by the applicable statutes of limitations.

Rule 56(e) of the Federal Rules of Civil Procedure states in pertinent part:

"... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

■ The rule means what it says. In opposition to a summary judgment motion made by a defendant, a plaintiff has the burden of producing evidence supporting his allegations. Failure to do so will result in summary judgment being entered against him. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968); *American International Insurance Co. v. Vessel SS Fortaleza,* 585 F.2d 22 (1 Cir., 1978) *(per curiam); Soar v. National Football League Players Ass'n.,* 550 F.2d 1287, 1289 n.4 (1 Cir., 1977); *Berard v. General Motors Corp.,* 493 F.Supp. 1035, 1037–38 (D.Mass., 1980).

■ Plaintiffs made no submission to meet this requirement. Plaintiffs' state-

ment, pursuant to Local Rule 8(N), of "Material Issues as to Which There Is a Genuine Issue to be Tried" identifies only one material fact in dispute on this motion: "When was it that plaintiffs became aware that said representations were false, fraudulent and misleading."[5] In support of their claim that such an issue of fact exists, plaintiffs did not identify any evidence by way of affidavits, deposition testimony, answers to interrogatories or admissions, to support this contention as contemplated by F.R.C.P. 56(b) and (e).[6]

In contravention of these rules, plaintiffs did not present one disputed fact issue that would preclude summary judgment—no affidavits or other evidence were adduced by plaintiffs to negate the very specific facts relied on by defendants, which facts are derived solely from the plaintiffs' own depositions, exhibits thereto, and their answers to interrogatories. Plaintiffs did not even assert affirmatively that they were unaware of the alleged misrepresentations before June 1, 1975.

### C. *Statute of Limitations*

 Where no specific limitation period is set forth for a federal claim, "the applicable limitations period would be that applicable to an analogous cause of action under state law". *Valles Salgado v. Piedmont Capital Corp.*, 452 F.Supp. 853, 858 (D.P.R., 1978).[7] Defendants have now moved for summary judgment on claims under Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act. No specific limitation period is provided by federal law for such claims. The issue, therefore, is what cause of action under Puerto Rico law

is most "analogous" to the fraud claims under Sections 17(a) and 10(b) and best effectuates the purpose of those statutes.

A comparison of Sections 17(a) of the 1933 Act and 10(b) of the 1934 Act (and Rule 10b–5) with Puerto Rico's civil action for securities fraud, 10 L.P.R.A. 890, makes clear their similarity and common purposes.

Section 17(a) of the 1933 Act provides: "(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly

"(1) to employ any device, scheme or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Section 10(b) of the 1934 Act provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange " * * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or

---

**5.** The remaining six "facts" in plaintiffs' Rule 8(N) submission relate (1) to whether the plaintiffs were defrauded when they purchased the investment program, a question that of course is entirely separate from whether plaintiffs waited too long to bring suit, and (2) to the class action issues.

**6.** Plaintiffs did not submit an affidavit showing that they are unable to present "facts essential to justify" their opposition to the present motion. F.R.C.P. 56(f). It is unlikely that they could have done so. Unlike *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82

S.Ct. 486, 7 L.Ed.2d 458 (1962), all information relating to when plaintiffs knew or should have known of the alleged fraud is peculiarly within their knowledge. Summary judgment is particularly appropriate in these circumstances.

**7.** *Accord, Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n.29, 47 L.Ed.2d 668 (1976); *Cook v. Avien, Inc.*, 573 F.2d 685, 694 (1 Cir., 1978); *Newman v. Prior*, 518 F.2d 97, 99 (4 Cir., 1975); *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 126 (7 Cir., 1972).

any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 is substantially identical to Section 17(a) of the 1933 Act, except that the rule protects sellers as well as purchasers.[8]

The language of the applicable provision of the Commonwealth Uniform Securities Act, 10 L.P.R.A. 890(a)(2) (1978), is, "for all practical purposes a verbatim repetition of Section 17(a) of the 1933 Act and Rule 10b–5(2) of the 1934 Act". *Valles Salgado*, 452 F.Supp., at 860. Section 890(a)(2) provides in pertinent part:

"(a) any person who

" * * *

"(2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue at law . . . ."

The federal policy of preventing fraud in securities transactions is the very same purpose that is effectuated by Section 890. Because of that identity of purpose between state Blue Sky laws and the federal securities laws, "during the last decade, the law has moved toward application of the blue sky law limitations period". *Wachovia*

*Bank & Trust Co. v. National Student Marketing Corp.*, 650 F.2d 342, 346 (D.C.Cir., 1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981). Indeed, many of those state Blue Sky laws are, like Puerto Rico's, based on the Uniform Securities Act and contain the same two-year limitation period as Section 890. Thus, the Virginia Uniform Securities Act limitation period was applied by the Court of Appeals in *Newman v. Prior*, 518 F.2d 97, 100 (4 Cir., 1975):

"(F)ederal policy is best served by applying the state blue sky's two-year statute of limitations to a suit involving the fraudulent sale of securities."

Similarly, the U. S. District Court for the District of Maine, has applied the Maine Uniform Securities Act two-year statute of limitation to an action under Section 10(b) of the 1934 Act:

"This is the proper statute of limitations to apply since Section 881(1)(B) bears the closest resemblance to the federal cause of action under Rule 10(b)—(5) . . . ."

*Dyer v. Eastern Trust & Banking Co.*, 336 F.Supp. 890, 906 (D.Me., 1971). *Accord, First Federal Savings & Loan Ass'n. of Miami v. Mortgage Corp.*, 650 F.2d 1376 (5 Cir., 1981); *Morris v. Stifel, Nicolaus & Co.*, 600 F.2d 139 (8 Cir., 1979); *Forrestal Village, Inc. v. Graham*, 551 F.2d 411 (D.C.Cir., 1977); *Fox v. Kane-Miller Corp.*, 542 F.2d 915 (4 Cir., 1976); *In re Alodex Corp. Securities Litigation*, 533 F.2d 372 (8 Cir., 1976); *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123 (7 Cir., 1972); *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8 Cir., 1970), *cert. denied* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). *See Hill v. Der*, 521 F.Supp. 1370, 1379–85 (D.Del., 1981); *Bohem v. Butcher & Singer*, 427 F.Supp. 355 (E.D.Pa., 1977).

---

**8.** Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(a) to employ any device, scheme, or artifice to defraud,

"(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."

Even as to state Blue Sky laws not based on the Uniform Securities Act, other courts have found persuasive that such statutes prohibit the same conduct, *i.e.,* fraud in securities transactions. *E.g., Carothers v. Rice,* 633 F.2d 7 (6 Cir., 1980), *cert. denied* 450 U.S. 998, 101 S.Ct. 1702, 68 L.Ed.2d 199 (1981); *O'Hara v. Kovens,* 625 F.2d 15 (4 Cir., 1980), *cert. denied* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981); *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 409 (2 Cir., 1975); *Schaefer v. First Nat'l Bank of Lincolnwood,* 509 F.2d 1287 (7 Cir., 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976); *Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996 (5 Cir., 1974), *cert. denied* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975); *McNeal v. Paine, Webber, Jackson, & Curtis, Inc.,* 429 F.Supp. 359, 362–63 (N.D.Ga., 1977).[9]

An additional reason for using the Section 890 limitations period is that Section 890's "limitation is also closer to the express limitation periods in the various sections of the federal act...". *Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d, at 127. *Accord, Cahill v. Ernst & Ernst,* 625 F.2d 151 (7 Cir.,

1980). Civil actions under Sections 11 and 12(2) of the 1933 Act must be brought "within one year after the discovery of the untrue statement or the omission" and in no event more than three years after the offer or sale. 15 U.S.C. 77m (1976). Sections 9, 18 and 29(b) of the 1934 Act have identical limitations. *Id.* 78i(e), 78r(c), 78cc(b). Actions under Section 16(b) of the 1934 Act are limited absolutely to two years after the event. *Id.* 78p. It is therefore clear that "Congress has not favored long limitations in private civil suits under the securities laws". *Newman v. Prior,* 518 F.2d, at 100 n.4.

Although the two-year limitations period of Puerto Rico's Blue Sky statute is applicable to the plaintiffs' federal securities claims, the provisions of that statute relating to when the period starts to run, *i.e.,* from "the contract of sale", is not applicable. Rather, for federal causes of action under the 1933 and 1934 Acts, the state limitation period begins to run on the date that the illegal action is or should have been discovered.[10] *E.g., Cook v. Avien, Inc.,* 573

---

**9.** Neither the Court of Appeals for this Circuit nor this Court have addressed the question whether the Commonwealth Blue Sky limitation period applies to a Section 10(b) action in Puerto Rico. The Court of Appeals has not considered that question with respect to any of the states within this Circuit. Although the Court of Appeals in *Janigan v. Taylor,* 344 F.2d 781 (1 Cir., 1965) *cert. denied* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), applied a two-year Massachusetts personal tort limitation period to an action under Section 10(b) of the 1934 Act, it did so without discussion of the applicability of a state Blue Sky law (344 F.2d at 783), presumably because there was no state Blue Sky statute at that time other than one prohibiting the sale of unregistered securities. Mass.Gen.Laws Ann. Ch. 110A, Section 6; *id.* Section 18. *Janigan* was followed in *Cook v. Avien, Inc.,* 573 F.2d 685, 694 (1 Cir., 1978), without further analysis, although by that time the State Securities Act had been amended to provide a cause of action analogous to Section 10(b). Mass.Gen.Laws Ann., Section 410(a)(2). However, since the tort limitation period and the newly-enacted Blue Sky limitation period were both two years, such a discussion was unnecessary. *See Collins v. Rukin,* 342 F.Supp. 1282, 1292 (D.Mass., 1972).

In the only District Court decision in the First Circuit where the issue was considered and

discussed, the United States District Court for the District of Maine applied a Blue Sky statute identical in all material respects to that in Puerto Rico. *Dyer v. Eastern Trust & Banking Co.,* 336 F.Supp. 890 (D.Me., 1971). In so doing, the court noted that it was "... aware that in *Janigan v. Taylor, supra,* the First Circuit applied the Massachusetts two-year statute of limitations for general tort actions... The court did so, however, without discussing any other possible blue-sky type of statute. Furthermore, it appears that the limitation period in the Massachusetts Blue Sky law is also two years.". 336 F.Supp., at 906 n.22 (citations omitted).

**10.** In *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) the Supreme Court held that tolling of the state statute of limitations on a claim under 42 U.S.C. 1983 during the pendency of a state court action, was to be determined by state law. That decision was based, in part, on the borrowing statute for federal civil rights cases (42 U.S.C. 1988). On the authority of *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946), doubt has been expressed whether the Court would reach the same result under the federal securities law claims in the circumstances presented here. *Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687

F.2d 685, 694–95 (1 Cir., 1978); *Gilman Bros., Inc. v. Peat, Marwick, Mitchell & Co.*, 486 F.Supp. 785 (S.D.N.Y., 1980); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1875); *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Hernández Jiménez v. Calero Toledo*, 604 F.2d 99 (1 Cir., 1979); *Janigan v. Taylor*, 344 F.2d 781 (1 Cir.), *cert. denied* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). Since this action was commenced on June 1, 1977, if the plaintiffs knew or should have known of the alleged misrepresentations prior to June 1, 1975, the federal securities law claims are time-barred. *See Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687 (10 Cir., 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981).

### D. *No Triable Issue of Fact*

Because the appropriateness of summary judgment is to be decided upon the particular facts of that case, in determining whether any issue remains for trial, we set forth in some detail the evidence offered by defendants. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 259, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569 (1968).

In opposition to the motion, plaintiffs claimed, without reference to evidence qualifying under Rule 56(e), that they were aware the alleged misrepresentations were false until after the Piedmont Funding Investment Programs were terminated on June 1, 1975. Those allegations of ignorance, are contradicted by plaintiffs' sworn deposition testimony, exhibits thereto, and their answers to interrogatories. Plaintiffs' three alleged misrepresentations are discussed separately:

*Did plaintiffs know, or should they have known that the Pacific Fidelity life insurance policy was not "cost-free"?*

 Plaintiffs' primary assertion is that they were told that the life insurance portion of the investment program was a bonus that "will not cost you one penny from your pocket". (Amended complaint, par. 23). Thus, Dr. Valles Salgado testified that Piedmont Funding representative Schwartz told him in June 1971 that the program would provide "an additional policy . . . which pays for itself". (Valles Salgado Tr. 61). Similarly, Dr. Mark stated that representative Finkelstein told him that the initial pledge of mutual fund shares, plus the additional shares purchased and pledged over time, plus the increases in value of those shares "would be sufficient to collateralize the loan to pay for the Pacific Fidelity policy". (Mark Tr. 44). Dr. González also claims to have believed "that the value of these shares . . . would be sufficient to offset the amount of money that I would need in order to maintain my insurance program". (González Tr. 43). The uncontradicted evidence shows that each plaintiff knew, or should have known, that such representations were not accurate long before June 1, 1975.

The Prospectus supplied to each potential investor by Piedmont Funding salesmen made clear that program participants might be required to supply additional collateral to maintain their life insurance coverage under the Program. On the very first page, in bold type, is the statement: "Attention is directed to 'Risk Factors' beginning on page 5 of this prospectus". (Valles

(10 Cir., 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). In *Rivera Fernández v. Chardón*, 648 F.2d 765 (1 Cir.) *rev'd on other grounds,* —— U.S. ——, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), the Court of Appeals noted that the limitations period provided by state law for the most analogous type of action, along with any state tolling rules, was to be applied to claims under 42 U.S.C. 1983 on the authority of *Tomanio*. It further held, however, that when the cause of action accrues is a question of federal law. In a *per curiam* opinion, the Supreme Court reversed, but also applied federal law to determine when the statute of limitations commenced, without referring to its decision in *Tomanio*. Under federal securities laws the statute of limitations begins to run, and thus the cause of action accrues, when plaintiff knew or through the exercise of reasonable diligence should have known of the alleged fraud. Accordingly, contrary to the suggestion in *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, application of federal law to plaintiffs' securities act claims appears to be entirely consistent with the Supreme Court's decision in *Tomanio*.

Salgado Ex. 4; Mark Ex. 3; González Ex. 2). The first of those "Risk Factors", headed "Commencement and Maintenance of Program", states:

"A decline or insufficient appreciation in the market value of a Participant's accumulated mutual fund shares may, therefore, result in his inability to meet the collateral requirements necessary to obtain additional premium financing. In such event, either additional collateral in the form of mutual fund shares will have to be furnished or part of the loan will have to be paid in order to avoid the involuntary termination of the Participant's Program and the sale of his mutual fund shares to satisfy his indebtedness." (*Id.*, p. 5)

The Prospectus, on pages 11 and 12, also specifically states that an investor may be required to pay additional cash in the event the market value of his pledged mutual fund shares falls below 150 percent of outstanding indebtedness:

"If the redemption value of the pledged shares declines below 150% of such indebtedness at any time prior to maturity of the Participant's note, the Participant will be so notified by registered mail... Such notice is given to afford the Participant an opportunity to consider whether to purchase additional shares for use as collateral under the loan, or in the alternative, *to reduce his indebtedness by a cash payment.*" (Emphasis added)

From the outset plaintiffs should have known of the possibility that an additional cash payment or purchase of mutual fund shares might be necessary to maintain the required collateral value.

The undisputed facts also show that each plaintiff did in fact know long before June 1, 1975, that he could be required to pay additional sums for the life insurance coverage because each of the representative plaintiffs *was* in fact required to make such payments. Dr. Valles Salgado in the summer of 1972 received a "renewal reminder" notice from Piedmont Funding informing him of a collateral shortage of $1,410 for the next renewal of his premium payment loan (Valles Salgado Ex. 11). He testified that when he had to pay additional cash to continue his insurance coverage was "where I realized that there was a ... that there was a problem here with this, that it was not quite what they had promised me". (Valles Salgado Tr. 116). Dr. Valles Salgado became so concerned, because "I thought that in this case I had been deceived" (*id.,* Tr. 145), that he wrote to Piedmont Funding's President asking that his investment program be cancelled (Valles Salgado Ex. 12). He also threatened to inform the Insurance Commissioner and Puerto Rico Securities Office (*id.*). Clearly, Dr. Valles Salgado knew no later than August 1972, nearly five years before this action was filed, that the Pacific Fidelity life insurance policy was not the cost-free "bonus" he claims to have been promised (*see* Valles Salgado Ex. 22, p. 5).

Dr. González also knew long before June 1975 that additional payments were required. In his deposition, Dr. González testified that, during his participation in the program, which began in early 1972, defendants repeatedly sought and received additional money either to purchase additional mutual fund shares as collateral for premium loans or to pay premiums, directly:

"Q. (By Mr. Baker) Okay. And throughout this period (from when you entered the program in 1972) you had to provide additional mutual fund shares for collateral for these loans?

"A. It was mostly money."

(González Tr. 57) (*see also* Answer to Set I of Piedmont Capital Interrogatories to Plaintiff González, par. 1).

Similarly, Dr. Mark testified that he was "struck ... (by) the fact that I had to be adding cash to increase the collateral for those loans...". (Mark Tr. 56). He testified that "in order not to lose my insurance policy, I had to put up the money". (*Id.*, Tr. 57). Dr. Mark paid an additional $1,500 on February 11, 1974, (Answer to Set I of Piedmont Capital Interrogatories by Plaintiff Mark, par. 1).

It is clear, therefore, that each plaintiff not only should have known, but did know, more than two years before this action was filed that it was not true that life insurance would be provided "without plaintiffs having to disburse any money". (Amended complaint, par. 22). Any claims based on alleged misrepresentations to the contrary are time barred.

### Did plaintiffs know, or should they have known, that the program was terminable by Piedmont Funding?

Plaintiffs also claim that it was falsely represented to them that Piedmont Funding was obligated to continue the program for at least ten years (amended complaint, pars. 24, 25, 29–31). Dr. González admitted that no such representation was made to him (González Tr. 49–50). But, even if it is assumed that such representations were made, it can hardly be said that plaintiffs "remained ignorant (of Piedmont Funding's power to terminate the program) through no fault of their own". *Morgan v. Koch*, 419 F.2d 993, 997 (7 Cir., 1969). There are numerous explicit statements in the Prospectus, which was given to the plaintiffs, that the program was terminable at Piedmont Funding's option, or that of the investor (González Tr. 22, 23; Mark Tr. 21; Valles Salgado Tr. 39). The seventh of the "Risk Factors" listed in the Prospectus, entitled "Financing", states with respect to the annual premium loans to be made by Piedmont Funding:

> "Continuance of the Programs depends partly upon the Company's ability to provide, or arrange for, loans to pay insurance premiums.
> " * * *
> "Although the Company does not now anticipate difficulty in obtaining money for insurance premium loans, no assurance can be given that such money will continue to be available. The Company's inability to obtain money for financing the insurance premium loan of a Participant could result in its inability to renew such loans which could adversely affect Program Participants. It is to the Com-

pany's economic advantage to continue the Program, and it intends to do so as long as funds are available therefor, but the Company is under no obligation to renew the loans to Participants."

(Valles Salgado Ex. 4; Mark Ex. 3; González Ex. 2, p. 7.)

References to Piedmont Funding's right not to renew the annual premium payment loans and, thus, not to continue the program appear elsewhere in the Prospectus. On page 13, the Prospectus states:

> "The Company is under no contractual obligation to refinance Participants' notes as they become due. . . ."

That the program could be terminated and the consequences of such termination is clear from page 12 of the Prospectus, which states under the heading "Termination of Program":

> "A program shall be terminated . . . (c) on any renewal date by the Company's failure to renew the Participant's note. . . . Upon termination of the Program the Participant shall be required to pay his note"

The insurance policy delivery receipts used by Piedmont Funding to record the delivery of the insurance policy to the investor state in even more explicit terms the fact that Piedmont Funding retained the power to refrain from making further premium loans:

> "I further understand that the Commitment on (Piedmont Funding's) part to finance each premium(s) shall likewise be cancellable at any time, but only in accordance with the premium financing arrangements as more fully described in the Prospectus mentioned above: Receipt of which is hereby acknowledged."

(Valles Salgado Ex. 8; Mark Ex. 5.)

Given the many explicit statements in the Prospectus and other documentation that Piedmont Funding reserved the right to terminate the program by declining to make additional loans, plaintiffs cannot maintain any claim on the allegation that they were never so informed. *See, e.g., Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340 (8 Cir., 1980); *Hoffman v. Estabrook*

& Co., 587 F.2d 509 (1 Cir., 1978); *Cook v. Avien, Inc.*, 573 F.2d 685 (1 Cir., 1978); *Hupp v. Gray*, 500 F.2d 993 (7 Cir., 1974); *Turner v. First Wisconsin Mortgage Trust*, 454 F.Supp. 899 (E.D.Wis., 1978).

Plaintiffs' dereliction of their duty to exercise reasonable diligence by their failures to familiarize themselves with the Prospectus is obvious, and, of itself, could provide sufficient grounds to grant the present motion. But, leaving aside whether, given the explicit statements in the Prospectus, plaintiffs could ever have a claim that Piedmont Funding's power to terminate the program was misrepresented, they were required to review the Prospectus and discover the above-quoted information when they became aware of the alleged misrepresentation that their insurance coverage would be cost-free, *i.e.*, when they "should have begun to 'smell a rat'". *Hoffman v. Estabrook & Co.*, 587 F.2d, at 519; *see Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9 Cir., 1980). Once investors come into possession of facts regarding representations that prove to be untrue, they have a duty to inquire further as to other representations. As the First Circuit has stated:

> "Once the 'inquiry notice' of possible omissions provided by the above facts have triggered the duty to exercise reasonable diligence, the statutory period did not 'await appellants leisurely discovery of the full details of the alleged scheme'."

*Cook v. Avien, Inc.*, 573 F.2d, at 696 (citations omitted). *Accord, Morgan v. Koch*, 419 F.2d, at 997.

Plaintiffs' contention here is analogous to that in *Sleeper v. Kidder, Peabody & Co.*, 480 F.Supp. 1264 (D.Mass., 1979), aff'd, 627 F.2d 1088 (1 Cir., 1980), where plaintiff claimed in a suit filed in 1975 that letters and memoranda dated in 1968, 1969 and 1970 contained misrepresentations in violation of Section 10(b) and Rule 10b–5. The investment in *Sleeper* was a limited partnership in a massive construction project, which was foreclosed by creditors in 1974. From 1970 onward the plaintiff had received requests for additional funds and other information that the court found should have put any investor on notice "that the project was not what it had been represented to be". 480 F.Supp., at 1268. Applying a two-year limitation period, the court dismissed the action as time-barred, explicitly holding the "storm warnings" necessary to commence the running of the time period as being "enough that the financial data reveal that things might not be what they were represented to be". *Id.*, at 1267. *Accord, First Federal Savings & Loan Ass'n of Miami v. Mortgage Corp.*, 650 F.2d 1376 (5 Cir., 1981). *See Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690 (8 Cir., 1981).

Plaintiffs possessed sufficient facts when, contrary to their professed expectations, they were required to put up additional cash or mutual fund shares to maintain their insurance coverage that they should have known "things might not be what they were represented to be". As the District Court in *Braunstein v. Laventhol & Horwath*, 433 F.Supp. 1077, 1078 (S.D.N.Y.) aff'd 573 F.2d 1288 (2 Cir., 1977), said: "There is no doubt that the fraud was discoverable" prior to June 1, 1975.[11]

### *Were the applicable interest rates misrepresented?*

Finally, the Court must turn to plaintiffs' allegations that it was falsely represented that the interest rate on loans from Piedmont Funding to pay insurance premiums

---

11. Plaintiffs may have only alleged a breach of promise with respect to the duration of the program. In paragraph 29 it is affirmatively alleged that the decision by the defendants to terminate the program was made "during the 1975 market fluctuations". Plaintiffs appear to acknowledge that the defendants' decision to stop loaning the plaintiffs money came after plaintiffs had entered the Program. If so, plaintiffs' claim is for breach of promise, a claim not cognizable under the federal securities laws. *See, e.g., Dorado Bay International, S.A. v. North Haven Briarwood Corp.*, (1975 Transfer Binder) Fed.Sec.L.Rep. (CCH) par. 95,280 (D.C.Conn., 1975); *Hsue Tung v. Broussard*, (1974 Transfer Binder) Fed.Sec.L.Rep. (CCH) par. 94,471 (D.D.C., 1974); *see also Restatement (Second) Torts*, Section 530 and comments (b) and (d) thereto.

"would never exceed" eight and one-half percent (amended complaint, par. 28). Like the other alleged misrepresentations, this one is contrary to the Prospectus provided to all of the plaintiffs, which states that "the interest to be charged by the Company will equal the New York City prime interest rate in effect at the time of the loan, plus such additional amount, not in excess of one and one-half percentage points, as the Company may determine". The Prospectus goes on to state that the interest rate will not be "more than the maximum permitted by the laws of the state in which the Participant resides". (Valles Salgado Ex. 4; Mark Ex. 3; González Ex. 2; at p. 11).

No contrary oral representation was ever made. Dr. Valles Salgado testified that "nothing was said" about the interest rates for the loans (Valles Salgado Tr. 130). Dr. Mark, when asked about the language in the Prospectus stating that "the interest to be charged by the Company will equal the New York City prime interest rate in effect at the time of the loan, plus such additional amount, not in excess of one and one-half percentage points, as the Company may determine", said that the quoted language was what he understood and what had been discussed (Mark Tr. 54). Interest rates were not a matter of concern for Dr. González. He testified, when asked if salesman Finkelstein had said anything about interest rates, that "I really believe that if he said it, it just passed by in the conversation" and that "I can't remember if it was four, five, six, I knew something, . . . ." (González Tr. 50–51)

In any event, if such a representation had been made, it was incumbent on plaintiffs, upon discovery, that they were being required to pay additional cash to maintain their Pacific Fidelity life insurance coverage, to review the Prospectus carefully to determine whether any other oral representations made to them might be at variance with the actual terms of the program. *Sleeper v. Kidder, Peabody & Co.*, 480 F.Supp. 1264 (D.Mass., 1979); *aff'd* 627 F.2d 1088 (1 Cir., 1980). Had they done so, they would have discovered that the interest rate was to be one and one-half points above prime, not to exceed legal maximums.

More important, however, plaintiffs have acknowledged that none of them ever in fact paid, or was asked to pay, more than eight and one-half percent interest. In its interrogatories to the representative plaintiffs, Piedmont Capital asked each to "state whether you were ever asked or in fact paid an amount in excess of 8½ percent 'on monies that would be borrowed to purchase insurance or to pay annual premiums'". All three representative plaintiffs answered in the negative (Answers to Interrogatory No. 2). It is clear therefore that the allegations of paragraph 28 of the amended complaint concerning the interest rate are without any support.

### Were there any actionable misrepresentations after June 1, 1975?

In an apparent effort to avoid the two-year statute of limitation, the amended complaint alleges that the fraudulent scheme continued after the programs were terminated on June 1, 1975 (amended complaint, pars. 35, 55, 74). The testimony of the representative plaintiffs demonstrates that there is no basis for any such allegation. Dr. Mark freely admitted that after January 1, 1975, no one told him anything about any aspect of the Piedmont Funding Investment Program that he considered to be false or misleading (Mark Tr. 80–81). Dr. González, at his deposition in September 1978, was still doing business with Finkelstein, the man who it is alleged defrauded him (González Tr. 51). Dr. González would not even say that Finkelstein had ever misled him (*id.*, Tr. 53–57). Dr. Valles Salgado, by the time the program was terminated on June 1, 1975, had been busily pursuing his complaints with the Puerto Rico Insurance Commissioner for at least two years (*e.g.*, Valles Salgado Tr. 131033). Dr. Valles Salgado, when asked by interrogatory to "describe each action or forebearance from action you took in reliance on (each) such misrepresentation or misleading statement" after June 1, 1975, did not claim any reliance, but instead stated that he "had already taken the case to the Commissioner

of Insurance of the Commonwealth of Puerto Rico". (Answer to Set I of Piedmont Capital Interrogatories by plaintiff Valles Salgado, par. 3(d)). Thus, Dr. Valles Salgado admitted he was not further misled after the termination.

Accordingly, the two-year statute of limitations on plaintiffs' federal securities law claims began to run far more than two years prior to the filing of this action, was not compounded after termination of the program, and, consequently, those claims are time-barred.

### E. The Commonwealth Claims

■ The Court's jurisdiction of the remaining Commonwealth claims is based on the doctrine of pendent jurisdiction. There being no remaining federal claims, the Court will not proceed to adjudicate the pendent Commonwealth claims. *E.g., United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Robinson v. Stanley Home Products, Inc.*, 272 F.2d 601 (1 Cir., 1959). We do not here further consider, as urged by defendants, that such claims are time-barred under the applicable Commonwealth statutes of limitations.

### III.

■ Having concluded that summary judgment against the plaintiffs is appropriate, it is also unnecessary to decide defendants' motion that this action not proceed as a class action. *Barceló v. Brown*, 78 F.R.D. 531, 535 (D.P.R., 1978); *García v. Rush-Presbyterian-St. Luke's Medical Center*, 80 F.R.D. 254, 260 (N.D.Ill., 1978). *See Board*

*of School Commissioners v. Jacobs*, 420 U.S. 128, 95 S.Ct. 846, 43 L.Ed.2d 74 (1975); *Boyle v. Madigan*, 492 F.2d 1180 (9 Cir., 1974). If plaintiffs individually have no claim, they have not met the requirement of F.R.C.P. 23(a)(3) that their claims be "typical" of those they seek to assert on behalf of the putative class. It is well settled that to be a representative of the class on a particular claim the plaintiff must himself have a cause of action on that claim. *See, e.g., Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–551, 7 L.Ed.2d 512 (1962); *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 462, 465 (9 Cir., 1973); *Levine v. Seilon, Inc.*, 439 F.2d 328, 335 n.10 (2 Cir., 1971); *See Board of School Commissioners v. Jacobs*, 420 U.S. 128, 95 S.Ct. 846, 43 L.Ed.2d 74 (1975).[12]

### IV.

Based upon the foregoing findings of fact and conclusions of law, and after examining the pleadings, depositions, exhibits thereto, plaintiffs' answers to interrogatories, and all other papers of record, it is hereby ORDERED that defendants' Motion for Summary Judgment is GRANTED;

IT IS ALSO ORDERED that this action be DISMISSED with prejudice; and

IT IS FURTHER ORDERED that the defendants recover of the plaintiffs their costs of action, including without limitation, pursuant to the Magistrate's Order filed December 14, 1979, and defendants' unopposed memorandum of expenses filed January 3, 1980, the sum of FOUR THOUSAND DOLLARS ($4,000.00).[13]

IT IS SO ORDERED.

---

**12.** *See also Robinson v. Penn Central Co.*, 58 F.R.D. 436, 443 n.10 (S.D.N.Y., 1973) ("one who has not stated a cause of action on his own behalf may not represent a class"); *Basch v. Talley Indus., Inc.*, 53 F.R.D. 14, 18–19 (S.D. N.Y., 1971) and the cases cited therein.

**13.** The Court has reviewed the Schedule of ·Expenses and Computer print-out attached to the memorandum of January 3, 1980. Additionally, the motion for order compelling discovery and for award of costs and attorney's fees, its supporting affidavits and briefs, including the reply affidavits to plaintiffs' opposition

of September 28, 1978, have been analyzed. The Court also considers, as part of the costs of the defendants the appearance made before the U. S. Magistrate on September 25 to argue their motion, and the trips made by mainland counsel to Puerto Rico for the taking of the aborted depositions, including hotel, food and land travel expenses.

Finally, the Court has scrutinized the expenses claimed by defendants in light of former Chief Judge José V. Toledo's Opinion and Order of April 28, 1978, in *Efraín Montero Torres, et al v. Rafael Hernández Colón, et al*, Civil No. 75–828, where the Court considered what were

the "customary fees in the community". All together, the sum granted is a reasonable one.