Raul F. RODRIGUEZ, et al., Plaintiffs,

v.

BANCO CENTRAL, et al., Defendants.

Civ. No. 82–1835 (JAF).

United States District Court,
D. Puerto Rico.

Nov. 27, 1989.

See also 790 F.2d 172.

Francisco M. López Romo and Nilsa M. Calabria Seda, San Juan, P.R., for plaintiffs.

Luis Sánchez–Betances and Ivonne Cruz–Serrano, Sánchez–Betances & Sifre, San Juan, P.R., for Banco Cent. Corp.

Diana Azizi de Arbona, San Juan, P.R., for Raoul Núñez.

Mario Oronoz, Hato Rey, P.R., Diana A. de Arbona, San Juan, P.R., Orlin P. Goble, Hato Rey, P.R., William de la Cruz, Jr., Alberto F. Tellechea, Orlando, Fla., José A. Andreu García, San Juan, P.R., and Vin-

cent Phillip Nuccio, Tampa, Fla., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

This complex land fraud case involves three related development projects in Florida which we will refer to collectively as the "Sunrise Projects." The numerous plaintiffs are disenchanted purchasers of plots of land in Sunrise Projects. Defendants include the corporate developers and financiers of the projects, as well as individuals associated with these businesses.

The essential allegations may be briefly stated. In the 1970's various individuals and related organizations were engaged in the sale of undeveloped land located in the state of Florida. The organizations include codefendants J.C. Investments, Inc., J.C. Properties, Inc., J.C. Realty, Inc., Floravest Realty, Inc., Floravest International, and Magic Realty (hereafter referred to together as "J.C. Companies"). Moreover, much of the financing for the Sunrise Projects was undertaken by codefendants Banco Central y Economías and Banco de Economías, the predecessors in interest of Banco Central (hereafter referred to together as "Banco de Economías").

Plaintiffs allege that they were induced to purchase their lots, and to continue making installment payments on them, in reasonable reliance on defendants' misrepresentations and unkept promises concerning the condition of the land, its value, and the plans defendants supposedly had to develop it. These misrepresentations allegedly took the form of written and oral statements from salespersons, as well as misleading statements found in defendants' mailed promotional literature. Plaintiffs claim that defendants' representatives led them to believe that the lots were good investments and suitable for homesites—or soon would be due to the development of roads, utilities and recreational facilities that would be undertaken by the defendants on plaintiffs' behalf. In fact, little development has occurred, nor in many cases could it have occurred given prohibitive zoning laws governing the land in question. Today, much of the area remains what it was when plaintiffs made their purchases: a swamp. In addition, plaintiffs allege they were duped into believing that upon completing their payments they would receive clear title to their lots, when in fact the titles were frequently owned by someone else or were heavily encumbered by outstanding mortgages.

Relief is sought under three federal statutes: a) the Interstate Land Sales Full Disclosure Act ("Land Sales Act"), 15 U.S.C. §§ 1701 *et seq.;* b) section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)(5) thereunder, 17 C.F.R. § 240.10b–5; and c) the Organized Crime Control Act ("RICO"), 18 U.S.C. § 1964(c).

The case is submitted on defendants' various motions for summary judgment. For the reasons discussed below, summary judgment is now GRANTED in favor of defendants with respect to claims under the Land Sales Act and the Securities Exchange Act, but DENIED with respect to the civil RICO claims.

## I. *The Land Sales Act*

Plaintiffs first allege that defendants violated subsections 1404(a)(2)(A)–(C) of the Land Sales Act and that defendants are therefore subject to civil liability under section 1410(b)(1) of the same. Subsection 1703(a)(2) reads as follows:

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—

\*    \*    \*    \*    \*    \*

(2) In selling or leasing, or offering to sell or lease, any lot in a subdivision—
(A) to employ any device, scheme, or artifice to defraud, or
(B) to obtain money for property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision and upon which the purchaser relies, or

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

15 U.S.C. § 1703(a).

In response to these allegations, two defenses under the Land Sales Act are raised. First, the defendants are united in claiming that plaintiffs' Land Sales Act claims are time-barred. Second, some, but not all, of the defendants argue that they are not "developers" or "agents" within the meaning of subsection 1703(a).

### A. The Statute of Limitations.

The Land Sales Act contains its own statute of limitations found at section 1711.[1] As originally enacted,[2] the exact time limit under section 1711 to some extent depends on which substantive provision of the act the claim is based. For example, actions to enforce a liability for false statements of record and false statements in property reports (not at issue here) must be "brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." However, actions such as the present one brought under section 1703(a)(2) (quoted above) are time-barred unless "brought within *two years after the violation upon which it is based*." (Emphasis supplied). Furthermore, in either case, the original section 1711 contains an "umbrella" limitation such that "[i]n no event shall any such action be brought by a purchaser more than *three years after the sale* or lease to such purchaser." (Emphasis supplied).

What this boils down to here is that each plaintiff must satisfy two tests: first, he must file within two years of the "violations" complained of; second, he must file within three years of the "sale." Only if both tests are met is the action timely.

■ Taking the first test first, we must decide when a "violation" occurs in order to determine when the two-year time period begins to run. Many courts have held, with regard to subsection 1703(a)(2) actions, that a violation may occur after the signing of the sales contract, especially when it is alleged, as plaintiffs have here, that the defendants engaged in ongoing fraud so as to continue to extract payments on purchase money loans and installment contracts. *See Newell v. High Vista, Inc.,* 479 F.Supp. 97 (M.D.Pa.1979); *Fogel v. Sellamerica Ltd.,* 445 F.Supp. 1269 (S.D.N.Y. 1978); *Husted v. Amrep Corp.,* 429 F.Supp. 298 (S.D.N.Y.1977); *Happy Investment Group v. Lakeworld Properties,* 396 F.Supp. 175 (N.D.Cal.1975). In such case, the last possible "violation" of the act, or the ending date for a continuing violation, is said to occur on the date of the last payment.

We agree with these cases. Therefore, because this action was filed on August 2, 1982,[3] plaintiffs making final payments pri-

---

1. 15 U.S.C. section 1711 (prior to amendment) reads as follows:

   No action shall be maintained to enforce any liability created under section 1709(a) or (b)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 1709(b)(1) of this title, unless brought within two years after the violation upon which it is based. In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser.

2. Section 1711 was amended by Congress in 1979, effective June 21, 1980. The parties apparently agree that the original statute of limitations applies rather than the amended version.

3. Both plaintiffs and defendants have raised arguments disputing the use of this date as a reference point for statute of limitations purposes.

   First, plaintiffs suggest that the proper filing date for all plaintiffs should be March 1, 1982, the filing date of a state court class action involving some of the same parties. We disagree, noting that the filing of the state law action in no way prevented plaintiffs from filing a timely federal action and thus does not toll the limitation period for the federal claims. *Drumm v. Sizeler Realty Co., Inc.,* 817 F.2d 1195 (5th Cir. 1987). *See also Ramirez de Arellano v. Alvarez de Choudens,* 575 F.2d 315 (1st Cir.1978) (so long as actions are not barred by the pendency of prior actions, prior judicial actions do not toll the statute of limitations, no matter how close their relationship to the one at bar).

or to August 2, 1980 fail the first test, while those making payments on or after this date satisfy the requirement.

■■■ The second test, or "umbrella limitation," requires an action to be brought within three years of the date of sale. Again, the crucial issue is one of definition, for the meaning of the word "sale" determines when the three-year period begins to run.

Defendants submit that "sale" in section 1711 refers exclusively to the date of the formation of the purchase contract. If this is correct, then *all* of the plaintiffs' causes of action under the Land Sales Act are time-barred because *all* the land sales contracts were signed more than three years prior to the filing of this action. Plaintiffs, however, argue that "sale" may also refer to the passing of the deed of title, and therefore the three-year time period, like the two-year limitation, does not begin running until the last installment payment on the sales contract is made.

The First Circuit has not addressed this question and the reported decisions appear to be split. The majority of these cases support defendants' theory. *See Cook v. Deltona Corp.*, 753 F.2d 1552 (11th Cir. 1985); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir.1980); *Armbrister v. Roland Intern. Corp.*, 667 F.Supp. 802 (M.D.Fla.1987). A minority of courts, however, agree with plaintiffs and construe "sale" to include the date the deed is executed or the last installment payment is made. *See Hadad v. Deltona Corp.*, 535 F.Supp. 1364 (D.N.J.1982); *Newell v. High Vista, Inc.*, 479 F.Supp. 97 (M.D.Penn. 1979).

The cases supporting plaintiffs begin by noting that a violation of section 1703(a)(2) may occur years after the signing of a contract, such as when the defendant "obtain[s] money for property by means of material misrepresentation...." 15 U.S.C. § 1703(a)(2)(B). When installment payments are scheduled for many years to come, so the argument goes, acts giving rise to a cause of action (obtaining money by fraud) might occur more than three years after the signing. If "sale" were to mean the signing date in these actions, then the buyer would be foreclosed from filing a claim against behavior apparently contemplated by the statute. Thus, plaintiffs argue it would be ill-fitting to adopt a narrow definition of "sale" in such a case, especially keeping in mind the court's duty to interpret a remedial statute broadly to fulfill its purpose.

Furthermore, cases such as *Hadad* distinguish between actions where liability is based on violations occurring after signing and those where liability may occur only at the time of signing. The latter type includes false statements or material omissions in the disclosure documents and "selling" the land without filing such documents in advance. *See, e.g., Fogel v. Sel-*

---

Second, defendants argue that August 2, 1982 (the date of the federal filing) cannot be used as a reference point for those plaintiffs joining the case after this date. To this end, defendants attempt to distinguish the case at hand from *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) and *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), both of which held that the commencement of a class action suspends the applicable statute of limitations as to all putative class members until class certification is denied. Defendants argue that the holding of these cases is limited to situations where certification of class status is denied solely for lack of numerosity, a view that ignores the fact that in *Crown, Cork & Seal* certification was denied for reason of inadequate representation. Even assuming some merit to defendants' view, the court finds that the underlying rationale of these cases has been met in the case at

bar: the filing of the class action served to put defendants on notice of the nature and extent of plaintiffs' claims, and it would have been inequitable and inefficient to require "protective" individual filings on the part of those plaintiffs who knowingly or unknowingly had a right to assume the class action would be protective of their interests.

Finally, we disagree with defendants' argument that tolling of the statute of limitations pending a ruling on certification should be denied because plaintiffs were not diligent in requesting class certification. While it is true that this action was originally filed on August 2, 1982, and class certification was not denied until March 17, 1987, we do not think this delay was unjustly used by plaintiffs to join additional members, especially in light of the fact that the last plaintiff allowed to join this suit was added on November 24, 1983.

lamerica, Ltd., 445 F.Supp. 1269 (S.D.N.Y. 1978). The court in *Hadad* concluded that interpretations of "sale" in the context of violations arising at the time of the signing should not be dispositive of cases where liability arises, at least in part, from fraudulent acts committed years after the ink is dry. *Hadad*, 535 F.Supp. at 1368. Rather, *Hadad* found that in cases alleging post-signing fraud, "sale" should include the time when the final payment is made and title transferred.[4]

We acknowledge that this view is appealing in terms of policy. However, it is contradicted by the structure of section 1711 which indicates, we think, that Congress was aware that certain violations could occur after signing but nevertheless chose to put a three-year cap on filings. As the court in *Aldrich* noted, this view is bolstered by the fact that regulations issued under the Land Sales Act define sale as "any obligation or arrangement for consideration to purchase." *Aldrich*, 627 F.2d at 1044 (*quoting* 24 C.F.R. § 1710.1(n)). Moreover, *Aldrich* also points out that the Securities Act of 1933, the general model for the Land Sales Act, defines sale to include every contract of sale or disposition of a security. *Aldrich*, 627 F.2d at 1044 n. 9.

Therefore, we hold that "sale" in section 1711 refers to the formation of the purchase contract. *Cook v. Deltona Corp.*, 753 F.2d 1552 (11th Cir.1985); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir.1980); *Armbrister v. Roland Intern. Corp.*, 667 F.Supp. 802 (M.D.Fla. 1987). This action was filed August 2, 1982, and so the claims of plaintiffs signing contracts prior to August 2, 1979 are time-barred. Because all plaintiffs fall into this category, summary judgment must be granted in favor of defendants absent the application of an equitable doctrine.

### B. Equitable Doctrines.

There are two distinct equitable barriers to application of the statute of limitations: equitable tolling and equitable estoppel. We now turn to these doctrines, keeping firmly in mind that the burden is on plaintiffs to demonstrate their applicability. *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir.1980), and cases cited therein.

#### 1. *Equitable Tolling.*

Plaintiffs look first to equitable tolling, particularly to the doctrine of fraudulent concealment. Absent Congressional intent to the contrary, principles of equitable tolling are to be read into every federal statute of limitations. *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Cook v. Deltona Corp.*, 753 F.2d at 1562. However, most courts interpreting section 1711 have concluded that while the two-year limitation may be tolled, the "in no event" preface to the three-year limitation evidences Congressional intent that this time period may not be suspended. *See, e.g., id.; Timmreck v. Munn*, 433 F.Supp. 396 (N.D.Ill.1977). We agree. Therefore, the principles of equitable tolling have no application to the Land Sales Act claims because all plaintiffs failed the second (three-year) test.

#### 2. *Equitable Estoppel.*

We next turn to equitable estoppel. This doctrine is appropriate when would-be plaintiffs are aware of the basis for a claim against a defendant, but the defendant has

---

**4.** As the court in *Hadad* observed,

[t]his interpretation of section 1711 makes eminent good sense and implements the purposes of the Original Act both to provide real estate purchasers with a remedy and to place a definable limit upon the time within which the remedy may be pursued in court. A real estate purchaser may enter into a contract which provides for payments for a period extending beyond three years. It is quite likely that he will not discover fraudulent conduct on the seller's part until he completes the payments and calls for performance. It would be absurd to hold that he could not sue because three years had run since the signing of the contract. Both the language of section 1711 and the intent of the Original Act are implemented rationally by interpreting "sale" to include not only the signing of the agreement but also all the steps implementing the agreement up to and including delivery of the deed.

*Hadad*, 535 F.Supp. at 1368–69.

lulled the plaintiffs into delaying or forgoing a legal remedy until after the statute of limitations has expired. *See generally Cook v. Deltona Corp.*, 753 F.2d at 1562–63. The oft-quoted rule is that

> [e]stoppel arises where one, by his conduct, lulls another into a false security and into a position he would not take only because of such conduct. Estoppel, in the event of a disputed claim, arises where one party by words, acts, and conduct led the other to believe that it would acknowledge and pay the claim, if, after investigation, the claim were found to be just, but when, after the time for suit had passed, breaks off negotiations and denies liability and refuses to pay.

*Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067 (7th Cir.1978) (*quoting Bartlett v. United States*, 272 F.2d 291 (10th Cir. 1959)). After a thorough review of the record, we find no facts indicating that the failure to file a timely action was due to an ill-motived attempt at appeasement. As it is clearly plaintiffs' burden to submit these facts, we hold that estoppel is not applicable to this action.[5]

As the equitable doctrines fail to afford plaintiffs relief, we hold that the claims under the Land Sales Act are time-barred and summary judgment is GRANTED to defendants accordingly. Given this determination, we need not decide whether defendants are "developers" or "agents" within the meaning of section 1404(a) of the Land Sales Act. *See, e.g., Bartholomew v. Northampton Nat. Bank of Easton*, 584 F.2d 1288 (3rd Cir.1978); *McCown v. Heidler*, 527 F.2d 204, 207 (10th Cir.1975); *Timmreck v. Munn*, 433 F.Supp. 396, 405–07 (N.D.Ill.1977).

## II. Securities Fraud

### A. Was There a Security?

The threshold issue under the federal securities laws is the existence of a security. *Union Planters National Bank v. Commercial Credit Business Loans Inc.*, 651 F.2d 1174, 1179 (6th Cir.1980). Plaintiffs apparently argue that the purchased lots, combined with defendants' promises to develop the area, constitute "investment contracts" included within the definition of a security.

The Supreme Court has defined "investment contract" broadly to include any "[1] contract, transaction or scheme whereby a person invests his money in a common enterprise and [2] is led to expect profits [3] solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). This definition can include interests in real property. *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); *McCown v. Heidler*, 527 F.2d at 208. However, in determining whether a real estate deal constitutes an investment contract, courts have paid particular attention to whether the developer's promotional emphasis was on the investment potential of the land or on selling lots to be occupied by the purchasers. "Clearly the lots are not securities if the purchasers were induced to obtain them primarily for residential purposes—'to occupy the land or to develop it themselves.' Similarly, if the benefit to the purchasers of the amenities promised by defendants was largely in their own use and enjoyment, the necessary expectation of profit is missing." *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d at 1036 (*quoting SEC v. W.J. Howey Co.*, 328 U.S. at 300, 66 S.Ct. at 1103) (other cites omit-

---

**5.** The defendants have submitted statements of material fact with respect to the majority of plaintiffs in this case. Here and elsewhere, we have reviewed these in making our determinations, as well as the pertinent objections filed by the plaintiffs. Where the facts submitted by one party are not seriously and specifically rebutted by the party bearing the burden of proof on a particular issue, or where the burdened party has otherwise failed to document facts in support of its position, we have found that there is no genuine issue of material fact as to this matter. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because each plaintiff bears the burden of demonstrating facts warranting the application of equitable estoppel, and because no such facts have been brought to the court's attention, we find no triable issue on this matter.

ted). *See also United Housing Foundation v. Forman,* 421 U.S. 837, 850, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975).

■ Furthermore, although the "necessary expectation of profit" can include the capital appreciation of the land due to development, *Forman, 421 U.S.* at 852, 95 S.Ct. at 2060, the increase in value must be the result of efforts promised to be performed by the developer. The mere hope that the value of purchased land will increase does not convert a run of the mill real estate transaction into an investment contract. *McCown,* 527 F.2d at 208. Indeed, there is an investment aspect to every land transaction arising from the hope of increased property values. But as the Supreme Court has stressed, there is also a strong motivation to purchase real estate for purposes of "consumption"—*i.e.,* to occupy it oneself or to develop it by one's own efforts. *Forman,* 421 U.S. at 853, 95 S.Ct. at 2060–61. The court must therefore consider the nature of the promotion to determine whether the emphasis was on the "investment" or the "consumption" side of the real estate duality.

Viewing the documents submitted in the light most favorable to the non-moving parties, Fed.R.Civ.P. 56, we find a significant emphasis on investment. First, a sales manual provided to J.C. salespersons anticipates customer objections and provides sellers with canned answers, many of which stress the investment value of Sunrise Projects.[6] These canned answers clearly indicate that J.C. salespersons used capital appreciation as an inducement to purchase.

Moreover, the key selling point running throughout all the promotional literature is the proximity of the land to Disney World and the increased development in the area Disney's presence would bring. Statements such as the "phenomenal growth and the extraordinary future impact of Walt Disney World," (*See* Exhibit 2), as well as predictions concerning the area's increase in population, income, development and tourism, are rife throughout the promotional materials. These statements lend additional weight to the argument that the plots were promoted as an investment.

Finally, the docket contains evidence indicating that defendants intended to develop the area. Plaintiffs have submitted documents showing that the J.C. Companies collected "dues" from various property owners for the purpose of constructing a country club in the area, and most of the

---

6. Examples of objections and answers emphasizing investment potential are the following:

   **Objection:** "I'm not ready to make investments right now."
   **Answer:** "[I]'ve called you because I have ideas that could earn you a lot of money without you having to lay out a lot of money yourself."
   **O:** "I'm not able to buy anything now."
   **A:** "I have called you because I have an idea that is going to represent money to you."
   **O:** "Look, the reality is that I'm not able to buy anything now, having made many investments recently."
   **A:** "Sr. Prospect, I don't believe that's a problem for a person of your economic solvency."
   **O:** "Look, I'm going to consult my wife on this matter."
   **A:** "I believe that's a good idea, but there's a reason you haven't thought of; why not give your wife a surprise by taking the initiative in deciding for yourself an investment that guarantees the economic future of your family?"
   **O:** "The investment looks good but I prefer to invest in Puerto Rico."
   **A:** "I believe that investing in Puerto Rico is a great idea, but the reasons for investing in the Disney area at this moment surpass all arguments to the contrary...."
   **O:** "I already have lands in Florida."
   **A:** "Fantastic, Sr. Prospect. With this you've proven that you believe in this type of investment; let me see where you bought ... Magnificent investment! But I'm going to demonstrate the special differences of our project."
   **O:** "It's a good investment, and a valuable one, but to who do I sell it to later?"
   **A:** "Sr. Prospect, according to the statistics, in 1971 sales of undeveloped land in the United States surpassed 27 million acres, the increase in value of this land guaranteeing you an extraordinary profit such that anyone, including myself, would be willing to buy it at a reasonable time."
   **O:** "But this project doesn't have streets or anything."
   **A:** "Precisely ... An investment in land is truly an investment when the cost is low, the quantity of land obtained is large, and the possibilities of acquiring greater value for this land are greater still ... When you buy without developing you are buying with all the benefits that your land is able to acquire."
   (Translation ours).

contracts provide a general maintenance fee, as well as a promise that the sellers will maintain community facilities until 1980. Moreover, J.C. promotional material mentions communal recreational facilities including a club house, swimming pool, tennis and racquetball courts, horse stables, a parking lot, guest chalets, water treatment facilities, a shuffleboard court, a shooting range, and a golf course. In addition, J.C. sent brochures showing floor plans for houses to lot owners, indicating that orders could be placed for construction. (*See* Exhibit D to Plaintiffs' Statements of Facts In Controversy). J.C. also implied that it would provide roads. (*See* Exhibit D). These planned improvements, while serving the "consumption" side of the duality insofar as they make the area a more attractive place to live, also add to the land's value. To the extent that these improvements were to be made with dues or with purchase price money from lot sales, the scheme falls within the "common enterprise" definition. *McCown v. Heidler*, 527 F.2d at 211; *Timmreck*, 433 F.Supp. at 404.

Defendants argue that they were under no contractual obligation to provide improvements, and indeed some of the promotional materials indicate as much. However, in determining the existence of an investment contract, courts have looked beyond boilerplate disclaimers to the economic reality and character the transaction is given in commerce. *SEC v. Joiner Corp.*, 320 U.S. at 352–53, 64 S.Ct. at 124–25; *Timmreck*, 433 F.Supp. at 400. Viewing the evidence in the light most favorable to plaintiffs, the court cannot conclude at present that these transactions fall outside the definition of an investment contract as stated in *Howey*. Rather, we find factual questions sufficient to defeat a motion for summary judgment as to whether defendants promoted Sunrise Projects as investment property and explicitly or implicitly promised to develop the same using common funds. *Bhatla v. Resort Development Corp.*, 720 F.Supp. 501 (D.C.W.Pa. 1989).

**B. Statute of Limitations.**

■ Defendants next argue that the statute of limitations has run on the securities claims. Since there is no statutory time limitation for private actions brought under section 10(b) and Rule 10b–5 of the securities laws, courts have applied the most closely analogous state rule. *General Builders Supply Co. v. River Hill Coral Venture*, 796 F.2d 8 (1st Cir.1983). In the past, this district has applied the two-year statute of limitations provided in Puerto Rico's Securities Act, 10 L.P.R.A. § 890(e), to federal securities claims. *Verrecchia v. Paine Weber*, 563 F.Supp. 360 (D.P.R.1982); *Salgado v. Piedmont Capital Corp.*, 534 F.Supp. 938 (D.P.R.1981). Moreover, it is well established as a matter of federal common law that the statute of limitations for claims under federal securities laws accrues when an investor, in the exercise of reasonable diligence, discovered or should have discovered the alleged fraud. *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123 (1st Cir.1987); *Cook v. Avien Inc.*, 573 F.2d 685, 695 (1st Cir.1978). Therefore, this action is time-barred if plaintiffs discovered or should have discovered the fraud prior to August 2, 1980.

Plaintiffs claim that the statute did not begin to run—or that it was tolled—until sometime after this date. As the First Circuit explained in *Cook:*

> [t]he doctrine of fraudulent concealment operates to toll the statute of limitations "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part ... until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 348 [22 L.Ed. 636] (1875) (footnote omitted). [E]ven without affirmative acts on the part of defendants, then, a federal cause of action will accrue at the time when plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains.

*Cook*, 573 F.2d at 694–95.

The court in *Cook* further explained that "storm warnings" sounding the possibility

of fraud place the plaintiff on inquiry notice and trigger a plaintiff's duty to investigate in a reasonably diligent manner. *Id.* at 697. Moreover, while the question of whether a plaintiff *should* have discovered the fraud is an objective one using the reasonable investor standard, "the determination of whether a plaintiff actually exercised reasonable diligence requires a more subjective inquiry focusing upon the circumstances of the particular case, including the existence of a fiduciary relationship, the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants." *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987).

With these standards in mind, we examine the record for "storm warnings" that should have put plaintiffs on inquiry notice of the fraud. First, we note that most of the sales contracts contain statements similar to the following: "SUNRISE ACRES IS UNIMPROVED, UNSURVEYED ACREAGE WITHOUT PHYSICAL ACCESS TO EACH INDIVIDUAL TRACT, WITHOUT DRAINAGE OR OTHER IMPROVEMENTS. 35% IS MARSH OR SWAMPY AND IS SUBJECT TO FLOODING."

Defendants argue that this representation alone was enough to trigger the requirement of due diligence, and that the statute of limitations thus began running with the signing of the contracts. We disagree and note that the nature of the fraud alleged is that defendants had promised to convert this unimproved land into a valuable residential community. In this sense, the promises to develop are not necessarily inconsistent with what is stated in the contract, thus distinguishing this case from others which hold that a plaintiff has a duty to investigate when representations made by salespersons are inconsistent with information contained in formal disclosure documents.[7] *See, e.g., Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d at 128–29. Moreover, the nature of the fraud also makes discovery at the time of signing unlikely, for "[i]t is self-evident that fraudulent promises to build certain amenities in the future cannot be detected at the time of the representations." *Timmreck*, 433 F.Supp. at 404; *see also Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041–42 (10th Cir.1980); *Fuls v. Shastina Properties, Inc.*, 448 F.Supp. 983 (N.D.Cal.1978).

Furthermore, defendants undertook acts construable as concealment. These acts include the mailing of "facto-grams" and other promotional literature describing in glowing terms the area's progress, as well as solicitations for membership in the Sunrise Country Club and brochures related to the construction of housing, all of which indicated that development was feasible and forthcoming. Thus, viewing the nature of the fraud, the opportunity to discover it, and defendants' subsequent actions, we cannot conclude as a matter of law that the quoted statements in the sales contract triggered further investigation.

Defendants next point to information found in the Florida Public Offering Statements for the Sunrise properties. This document includes the following warnings: that Sunrise Projects is not a homesite offering, that it is encumbered by mortgages, that no provision has been made for sewage, water, streets or other public utilities, that the property is not useful for building, that a certain percentage of the land is marsh or swampy, and that the buyer should seek professional guidance and ascertain for himself that the property meets personal requirements.

Defendants claim that each and every plaintiff received the offering statement

---

7. We also note that the Spanish version of the contract mistranslates "MARSH AND SWAMPY" as "BAJO"—*i.e.,* "LOW." Moreover, there is evidence in the record that this was no accident and that sellers were instructed to capitalize on this mistranslation. For instance, the manual for salespersons contains the following canned "objection" and "answer":

**Objection:** [B]ut here it says that 35% is a low zone; what does this mean?

**Answer:** [Y]ou should sign this document because this is the way we show the seriousness of our operation. Sunrise Acres is an extremely large extension of land, 3,000 acres with levels 120 to 150 feet above sea level … it's natural that some parts are lower than others.

prior to purchase, and if this allegation were uncontested we would hold that the offering statement supplied the "storm warnings" to trigger due diligence.[8] *Armbrister v. Roland Intern. Corp.*, 667 F.Supp. at 810–11. However, many plaintiffs state, in depositions and elsewhere, that they never received the offering statement in spite of the fact that they may have signed documents indicating they did. Indeed, while defendants have submitted signed offering statement "receipts" as well as signed blanket statements claiming the signatory "has received all documents relevant to the contract," rarely have they submitted the actual offering statement to go along with the so-called receipts. *See generally* Defendants Statements of Uncontested Facts. Therefore, we find a question of fact as to when and whether many of the individual plaintiffs received the Florida Public Offering Statement.

In the end, however, defendants do not need to rest their case on contractual disclaimers or disclosure statements. Since this action was filed on August 2, 1982, the only question that matters is whether, with the exercise of reasonable diligence, the fraud alleged was discoverable prior to August 2, 1980. Undoubtedly it was.

8. We are of course mindful that some plaintiffs have admitted receiving and reading the offering statement, and in such cases a determination that due diligence was triggered would be in order. We need not make such rulings on a plaintiff-by-plaintiff basis, however, given our objective holding, *infra*, that all plaintiffs should have discovered the fraud prior to August 2, 1980.

9. The following are examples of plaintiffs who uncovered facts that should have put them on notice of the fraud prior to August 2, 1980: Miguel Cires Blanco and Evelia Méndez Cantón (told by friend in 1976 that area was inaccessible and that he had been defrauded); Andrés Rodríguez Rivera and Edelmira Rivera Nieves (visited lot in 1976 and not satisfied); Miguel Palacios Calzada and Antonia Mercado Soto (visited lot in 1977 and saw that land was flooded); Jesús E. Hernández and Celia Acosta (visited area in 1976 and "knew" he had been defrauded); Ezequiel Maldonado and Casilda Castrello (tried to sell lot since 1976 because had been told land was floodable and not valuable); José A. Crescioni and Sonia Cuebas (visited lot before 1980 and saw no development); Humberto Torres and Provinés Méndez de Torres

By August 2, 1980, virtually all of the sales contracts were several years old. Even assuming plaintiffs signed due to false promises to develop, and that these promises were fostered over the years by fraudulent mailings, there nevertheless came a time for the investors to seek hard information as to whether these promises were more than castles in the air. That time, though hard to pinpoint, nevertheless occurred prior to August 2, 1980. In reaching this determination we note the following: (1) By late 1978 various Florida agencies were issuing cautionary statements regarding the Sunrise Projects. These statements mention that on March 2, 1978 a Florida court issued a cease and desist order in relation to misleading and unapproved Sunrise advertisements, and that J.C. Investments filed for bankruptcy that same year. (2) The campaign of fraudulent mailings largely ended with the cease and desist order; there are few examples of facto-grams or housing and country club solicitations after this date. (3) Virtually every plaintiff who visited the Sunrise site in Florida in the late 1970's or early 1980 was able to uncover a cause for disappointment.[9] (4) And finally, beginning in late 1978, newspaper articles began appearing

(visited area in 1978 and grew suspicious upon not receiving information sought); Amelia Cabiya Martínez and Gregorio Alfonso Reyes (dissatisfied after 1978 visit); Luis A. Rosario (grew suspicious after seeing no development upon visits in 1974 and 1976); Josés Luis Martínez and Carmen Vital (saw land was "swampy" during several visits beginning in 1975); Angelina San Miguel (disappointed upon visit in 1978); Francisco Fontanet Perfecto and Aida Maldonado de Fontanet (suspected "bad deal" after visit in 1975); Nicolás Ayala Pláceras and Dinorah F. Ayala (saw lots flooded in 1978); Hilton Montes Gaztambide and Ramonita Medina Rivera (letter dated 1/21/80 detailing visits and suspicions re: lack of development); Luis Becerra González and Tomasa Lamberty (saw that area was a swamp and conducted inquiries around 1974–75); Luis F. Suárez (visited area; heard he could not register property); Victor Rivera Inglés and Teoldula Santos (disenchanted after visit in 1976); Julio C. Aguilar Morena and Alfa Caridad Núñez Hernández ("nearly cried" after visiting area in 1976); Josés Maldonado Crespo and Carmen Ortiz Collado (had doubts and worries about the project since 1977); Paul Rodríguez Rodríguez and Josephina Rivera San-

in Florida and Puerto Rico expressing problems and dissatisfactions with development projects in Florida's Green Swamp area.

Viewing the record in the light most favorable to plaintiffs, the court finds nothing to rebut this combination of factors or to support the conclusion that plaintiffs' ignorance of the fraud justifiably extended into August of 1980. Thus, while we cannot determine as a matter of law that due diligence was triggered at the time plaintiffs signed their contracts, we can and do conclude as an objective matter that plaintiffs should have discovered the fraud prior to August 2, 1980. As such, all the securities fraud claims in this case are time-barred and summary judgment is GRANTED to defendants on this part of the complaint.

### III. *Civil RICO*

We finally turn to the civil RICO claims. Section 1964(c) provides a civil remedy to "[1] Any person injured in his business or property [2] by reason of a violation of section 1962 of this chapter...." 18 U.S.C. § 1964(c). Plaintiffs have adequately demonstrated injury to their property to the extent of payments made under purchase contracts. However, we must inquire whether this injury occurred "by reason of a violation of section 1962."

Section 1962 prohibits: the use of income derived from a pattern of racketeering activity to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce, section 1962(a); the acquisition or maintenance of any interest in an enterprise through a pattern of racketeering activity, section 1962(b); conducting or participating in the conduct of an enterprise through a pattern of racketeering activity, section 1962(c); and conspiring to violate any of these provisions, section 1962(d). *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

Of these four "prohibited activities," the only one specifically mentioned in plaintiffs' amended complaint [10] is subsection 1962(a), concerning the investing of money gained from a pattern of racketeering. Nevertheless, we note that the facts alleged in the amended complaint also sound in a violation of subsection 1962(c). Thus, we will examine defendants' arguments for dismissal with these two provisions in mind.

### A. Standing To Assert a Violation of 1962(a).

█ As an initial matter, defendants in a recent filing have questioned whether

---

tiago (made insecure by visit to area in 1979); Carmen Vélez Rivera (quit making payments in 1979 because not happy with purchase); Heriberto Alvarado and Ana Luisa Santos (saw water and no development upon visit in 1979); Juan C. Montalvo Ruiz and Luz Minerva Márquez (not satisfied with area after visit in 1978); Vilma Mosquera (very disappointed after visit in 1977 and requested that her lot be sold); Ramón A. González Padilla and Hilda E. Lugo Rivera (saw area undeveloped and felt uncomfortable after visit around 1980); Mario Santiago Rodríguez and Carmen Aurora Ortiz Claudio (visited area around 1980 and told by a passerby that the development companies had left); Alejo Pérez Ortiz and Carmen Pérez Muñoz (tried to sell lot in 1980 because had information the project was not developed).

Other plaintiffs discovered problems with their lots and had them exchanged for others. They are: Carmelina Martínez and Don Santesson; Eddie Aguilú Emmanuelli and Carmen Alicia Semidey Rolón; William Rodríguez Lugo and Elsie H. Pérez.
*See* Defendants' Statements of Material Facts Not In Controversy and plaintiffs' objections thereto.

**10.** Plaintiffs requested permission to file, and in fact submitted, an amended complaint on June 10, 1988. *See* Docket Document No. 401. The court denied that request in an order dated July 27, 1988, referring to defendants' motion in opposition to the amended complaint at Docket Document No. 406. We now clarify and reconsider that order in the following manner. The amended complaint of June 10, 1988 is rejected insofar as it attempts to bring new plaintiffs into this action or to state any new causes of action under Puerto Rico law not previously alleged in the original complaint. However, we think it proper that the June 10th complaint should govern the cause of action under civil RICO, and to this extent our order is altered. In making this determination, we note the policy in civil RICO actions to allow amendment of the complaint following adequate discovery so as to comply with the requirements of Fed.R.Civ.P. 9(b). *See New England Data Services, Inc. v. Becher,* 829 F.2d 286 (1st Cir.1987). Thus, we recognize the June 10th complaint as the one governing this action, striking, however, any attempt by plaintiffs to add additional parties or additional state law causes of action.

plaintiffs have established a nexus between their injuries and a 1962(a) violation[11] such that would bestow standing under section 1964(c). Most courts addressing this issue have held that the gist of a 1962(a) violation is the use or investment of racketeering income, and that in order to have standing to sue one's injury must be derived from such use or investment. *See Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149–50 (10th Cir.1989) (and cases cited therein); *Bhatla v. Resort Development Corp.*, 720 F.Supp. 501 (D.C.W.Pa.1989). Other courts, however, have concluded that injury from racketeering activity alone is sufficient to confer standing to assert a 1962(a) claim. *See, e.g., In re National Mort. Equity Corp. Mort. Pool Certif. Sec. Litig.*, 682 F.Supp. 1073, 1081–82 (C.D.Cal. 1987); *Smith v. MCI Telecommunications Corp.*, 678 F.Supp. 823, 828–29 (D.Kan. 1987); *Louisiana Power & Light v. United Gas Pipe Line*, 642 F.Supp. 781, 806–07 (E.D.La.1986).

Those courts not requiring investment-related injury emphasize the policy to construe RICO broadly to fulfill its remedial purpose. They also point out that requiring investment-related harm, combined with a holding under subsection 1962(c) that a corporate defendant cannot be both a "person" and an "enterprise," *e.g., Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir.1986), would insulate most corporate defendants from civil RICO liability.

Be that as it may, the court in *Grider* correctly observed that such concerns "cannot justify expanding section 1962(a) beyond the limits of that subsection's own language." *Grider v. Texas Oil & Gas Corp.*, 868 F.2d at 1150 (*citing Schofield*, 793 F.2d at 30). Subsection 1962(a) clearly prohibits the use or investment of income from racketeering activity, and subsection 1964(c) just as explicitly requires injury by reason of such a violation. Moreover, the *Grider* court noted that this reading accords with the Supreme Court's observation in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285. We therefore side with those cases supporting defendants.

Here, the injuries averred in plaintiffs' amended complaint consist of the money paid on land purchase contracts as well as amounts paid in maintenance and country club membership fees. In no way do the injuries arise from the investment or use of racketeering profits. Thus, we hold that the purchasers of Sunrise lots have no standing to seek redress for a violation of subsection 1962(a).

### B. "Person" and "Enterprise" Under 1962(c).

We next turn to subsection 1962(c)[12], where plaintiffs face a different kind of obstacle. As we alluded above, the First Circuit holds that under subsection 1962(c) the "person" who engages in the pattern of racketeering activity (*i.e.*, the defendant) must be distinct from the "enterprise" affecting interstate commerce; under subsec-

---

**11.** Subsection 1962(a) reads (in pertinent part) as follows:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

\* \* \* \* \* \*

18 U.S.C. § 1962(a).

**12.** Subsection 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

tion 1962(c) the "enterprise" is not liable. *Odishelidze v. Aetna Life and Casualty Co.*, 853 F.2d 21, 23 (1st Cir.1988); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 29 (1st Cir.1987); *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir. 1986). Nor can the corporation be held liable under *respondeat superior* and other agency doctrines so long as it also plays the role of the enterprise. *Schofield*, 793 F.2d at 32–33.

Here, the amended complaint states the "enterprise" element as follows: "Defendants used the income ... to operate 'J.C.', its 'Agents,' and Banco Central, a banking institution, all *enterprises* engaged in interstate commerce." Amended Complaint at ¶ 103 (emphasis supplied). This language apparently contemplates three separate RICO enterprises, each of which is a named co-defendant. Read this way the complaint as it now stands fails to state a claim under subsection 1962(c) against "J.C., its Agents and Banco Central."

We hesitate, however, to reach "the draconian result of dismissal," *New England Data Services v. Becher*, 829 F.2d 286, 289 (1st Cir.1987), based on the unartful pleading of plaintiffs' attorneys, especially when it appears from the complaint that a proper enterprise exists consisting of "an association in fact" among the various defendants.[13] *See Fleischhauer v. Feltner*, 879 F.2d 1290, 1297 (6th Cir.1989). In a case with facts analogous to those at hand, the Second Circuit held that a RICO enterprise could consist of the persons in association with one another for the purpose of selling condominiums. *Beauford v. Helmsley*, 865 F.2d 1386 (2nd Cir.1989) (*en banc*). In the case at bar, if the enterprise is viewed as

all those "associated in fact" in the Sunrise campaign, then all the co-defendants can serve as "persons." Alternatively, we note that the complaint may be read more flexibly so that only one of the three listed enterprises—J.C., its Agents, and Banco Central—serves in the enterprise role, thus saving the action against the other two. *See Roeder*, 814 F.2d at 28–29.

We find that justice is best served by granting plaintiffs the opportunity to replead the enterprise element of their complaint. Therefore, subject to appropriate amendment, we decline to dismiss the RICO action against the corporate codefendants.[14]

## C. The Pattern Requirement.

Defendants next submit that plaintiffs cannot prove "a pattern of racketeering activity." The Supreme Court recently elucidated the pattern requirement in *H.J. Inc. v. Northwestern Bell Telephone Co.*, — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). There, the Court found that although two predicate acts within ten years are required by the statute, 18 U.S.C. § 1961(5), two acts standing alone may not be sufficient. *Northwestern Bell*, 109 S.Ct. at 2899, citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). In order to form the requisite pattern, the predicate acts must be related and amount to, or threaten the likelihood of, continued criminal activity. *Northwestern Bell*, 109 S.Ct. at 2901–02. Moreover, the Court found that proof of neither relationship nor continuity requires a showing that the predicate acts were committed in further-

---

**13.** "Enterprise" under 18 U.S.C. section 1961(4) "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

**14.** We also note that defendants raise other arguments under the "enterprise" rubric. Essentially, defendants claim that the association of co-defendants was not sufficiently continuous to qualify as a "RICO enterprise." Although some courts have read a continuity requirement into the definition of enterprise, we note that this requirement recently has shifted to the pattern

element and that several decisions have dropped the continuity factor from enterprise analysis. *U.S. v. Indelicato*, 865 F.2d 1370, 1382 (2nd Cir.1989); *Beauford v. Helmsley*, 865 F.2d at 1391. This trend seems likely to continue following the Supreme Court's decision in *H.J., Inc. v. Northwestern Bell Telephone Co.*, — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Even assuming the retained vitality of the continuity factor, we find a genuine issue of material fact as to whether an association of the defendants was sufficiently ongoing so as to fulfill this requirement.

ance of multiple criminal schemes. *Id.* at 2899.

Plaintiffs allege as predicate acts numerous violations to federal securities laws.[15] *See* Amended Complaint, Docket Document No. 401, ¶ 102. As discussed in section II.A of this opinion, we find a question of fact as to whether the purchase agreements constitute investment contracts within the meaning of the Supreme Court's decision in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Thus, plaintiffs have alleged numerous instances of "racketeering activity" under the statute.

Nor do we have trouble finding that the predicate acts fulfill the Supreme Court's test of "relationship" and "continuity" as set forth in *H.J., Inc. v. Northwestern Bell Telephone Co.* Most of the lots in question were sold in the early-to-mid 1970's over a six-year time span. Moreover, they were sold as part of a scheme perpetrated by a web of interconnected developers. There is evidence indicating a uniformity in sales techniques and financings. In addition, the facto-grams and other mailings are clearly follow-up or "servicing" measures arising from the original sales. As such, the predicates in this case are related. Finally, we find that the alleged illegal activity was continuous or threatened to be continuous, because the Sunrise Projects campaign started in 1969 and persisted over a decade before finally being derailed by bankruptcy and other legal action in the late 1970's and early 1980's. Therefore, we hold that plaintiffs have established "a series of related predicates extending over a substantial period of time." *Id.* at 2902. *See also Beauford v. Helmsley*, 865 F.2d 1386 (2nd Cir.1989) (*en banc*) (pattern of racketeering activity found in fraudulent offering of condominiums); *Bhatla v. Resort Development Corp.*, 720 F.Supp. 501 (D.C.W.Pa. 1989) (same).

D. Liability of the Financiers.

■ At this juncture, certain codefendants, particularly the corporate financiers and their directors and officers, argue that even if there was a pattern of racketeering activity, there is no evidence they were part of it.

While the parties have been lax in suggesting a legal standard for a financier's liability under RICO, we begin by noting the statute itself. Subsection 1962(c) makes it a violation "to conduct or participate, directly or indirectly," in an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c). We read this to require some nexus between the financier's actions and the predicate acts causing plaintiffs' injuries. *See Brandenburg v. Seidel*, 859 F.2d 1179, 1188–90 (4th Cir. 1988); *see also Bhatla v. Resort Development Corp.*, 720 F.Supp. 501 (D.C.W.Pa. 1989) (dismissing civil RICO claim against one corporate financier of condominium project while denying dismissal against other financier whose alleged involvement also included development and marketing). A financier acting in the normal course of business cannot be held liable for the developer's misdeeds. *Cf. Cumberland Capital Corp. v. Harris*, 621 F.2d 246, 251 (6th Cir.1980) ("lending institutions acting in the normal course of business" not liable under the Land Sales Act).

■ Nevertheless, we also acknowledge the possibility that the defendant financiers might be liable under a theory of aiding and abetting. While the First Circuit has not addressed the issue of aiding and abetting in the civil RICO context, we note that other courts have found this doctrine applicable when other RICO criteria are met. *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1356, 1359–60 (3rd Cir.1987); *Armco Industrial Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 485–86 (5th Cir.1986). We also note that subsection 1962(c) contemplates civil RICO liability for "indirect" participation in a pattern of racketeering activity. Therefore, we hold that a "person" may be liable under section 1962(c) by means of aiding

---

**15.** "Racketeering activity" is defined in section 1961(1) and specifically includes, *inter alia*, any "offense" involving securities fraud. 18 U.S.C. § 1961(1).

and abetting the pattern of predicate acts.[16]

Because the predicate acts in this case consist of securities fraud, aiding and abetting may be established by proving: (1) a securities violation by the primary party; (2) that the aider and abettor had a general awareness of its role in a securities violation; and (3) that the aider and abettor had knowingly rendered substantial assistance in the violation. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104 (5th Cir.1988). Thus, we look to the docket for evidence of the financier's knowledge of and assistance to the alleged fraud.

We begin by noting that high Banco de Economías officials, both in their personal capacity and through Empresas Financieras, supplied loans for the purchase of land that would become Sunrise Acres.[17] These officials include Colón Nevarez (president of Banco de Economías' board of directors, executive committee member, and president in 1975), Luis Martínez Almodóvar (president and director), William de la Cruz (director), Wallace González Oliver (director), and Martínez Echevarría (Executive Vice President). The loans were provided subsequent to two separate studies of the Sunrise Projects conducted by Colón Nevarez and Echevarría and were backed up by a mortgage on the Sunrise properties, thus giving rise to the inference that bank officials had knowledge of J.C.'s general activities and the quality of the collateral.

Also, in return for services rendered, Empresas Financieras and certain bank officials received shares in J.C. Investments amounting to 56% of all outstanding stock.[18] These shares were eventually sold back to J.C. in exchange for 100 acres of Sunrise properties and $400,000 to be paid from Sunrise sales proceeds into an escrow account administered by Banco de Economías. Moreover, Jorge Colón Nevarez served on J.C.'s board of directors from 1970 to 1972, and he and other bank officials reportedly visited the Sunrise Projects in Florida, were aware of certain advertisements, and filed documents on J.C.'s behalf with the Florida Land Sales Board. Thus, a jury could conclude that high-ranking bank officials not only had knowledge of J.C.'s activities, but also a personal interest in their success.

Furthermore, J.C. salespersons were instructed to stress the Banks' financial backing of the project, to tell potential customers that their names had been obtained from a list provided by the Banks, and to carry with them the Banks' loan application forms. (*See* Exhibit A, Plaintiffs' Statement of Material Facts in Controversy). Several plaintiffs have also alleged that they bought their land in reliance on the Banks' backing of the project. Thus, we

---

**16.** Although we acknowledge room for disagreement, we do not believe that finding aiding and abetting liability under section 1962(c) is inconsistent with the First Circuit's teaching in *Schofield,* 793 F.2d at 33, so long as the aider and abettor is not also the "enterprise." While *Schofield* rejected the use of *respondeat superior* when the corporation was an "enterprise" under section 1962(c), it did not rule out the use of this doctrine, much less aiding and abetting, when the defendant does not constitute the "enterprise" in that subsection. To the contrary, the court stated that it "wholeheartedly agrees that corporations should not escape liability when their policies foster the racketeering activity that is at the heart of RICO's prohibitions." 793 F.2d at 33. The court further agreed with the proposition found in *Bernstein v. IDT Corp.,* 582 F.Supp. 1079, 1083 (D.Del.1984), that "the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent," but found such contrary intent when the defendant was also the enterprise. In any event, we need not address the adoption of *respondeat superior* doctrine, but rather merely accept the aiding and abetting theory, as expressed by the Third and Fifth Circuits, which requires significant participation on the part of a defendant that is not the enterprise.

**17.** The record indicates that a $200,000 loan was supplied by Jorge Colón Nevarez, Luis Martínez Almodóvar, and William de la Cruz, acting in their personal capacities. Another $350,000 loan was supplied by Empresas Financieras, a venture organization consisting of Banco de Economías officials, although in actuality this loan appears to be made by Banco de Economías itself and was merely guaranteed by Empresas Financieras. *See* Deposition of Jorge Colón Nevarez at 114.

**18.** Thirteen percent of J.C. stock was owned by Empresas Financieras; 10% by Luis Martínez Almodóvar; 10% by Jorge Colón Nevarez; 10% by William de la Cruz; 10% by William Carpenter; and 3% by Juan Martínez Echevarría.

find evidence in the record supporting the inference that the Bank allowed its name to be used for promotional purposes.

Finally, in 1973 Banco de Economías became engaged in a "very complex and highly unusual" arrangement with J.C. Investments to finance the retail sales of Sunrise lots. *See* Plaintiffs' Exhibit No. 145 at 2. Under this arrangement, J.C. brought prospective land purchasers to the Bank who in turn would lend each purchaser 50% of the unpaid balance on the contract. The balance of the loan proceeds, however, would not be turned over to the purchaser but to J.C. Investments via a deposit in three different escrow accounts which in turn financed mortgages and operational needs, as well as outstanding loans. A similar arrangement was described by the auditing firm of Arthur Anderson as a "dealership agreement" for the sale of Sunrise lots.

We think that the foregoing could support a jury finding that the bank and its high officers had a general awareness of the fraud and that their actions and omissions constituted significant assistance in its perpetration. Therefore, we conclude that the question of the individual and corporate financiers' involvement in J.C.'s dealings is not ripe for summary disposition at this time.[19]

**19.** The following is a summary of plaintiffs' allegations against key codefendant financiers. Although not all of these allegations are backed up with affidavits or other documentary evidence, the record does contain evidence sufficient to raise a triable issue of fact. Nevertheless, all moving codefendants may be assured that the question of their liability will not reach the jury absent specific evidence at trial indicating their participation as an aider and abettor of the fraud.

*Banco de Economías/Banco Central:* arranged for financing the down payment for the purchase of the lands which constitute the Sunrise properties; approved false and deceptive advertising materials; allowed the offering of streets to be built in the Sunrise Projects; knew that the promotion and offerings being carried out for the sale of the Sunrise projects were false; knew that 35% of Sunrise Acres was marsh or swampy and subject to flooding; knew that 100% of the lots were being sold; allowed the representing to plaintiffs that the Sunrise lots were good and sound investments; allowed the obscuring and/or down playing of the importance of the written warning placed in the contracts; approved the misleading translation of the purchase and sales contracts; knew that there were lots being sold although they were heavily encumbered; allowed others to circumvent the cease and desist order issued by the Florida Land Sales Board and to continue promoting the sale of Sunrise lots; established the system of loans in order to finance the purchases of the lots; participated as promoter of the Sunrise Projects; fostered the misrepresentation of the value of the lots by allowing the misrepresentation of the financing arrangement with the purchasers as mortgagees; ignored inquiries from purchasers regarding the lots purchased; failed to make payments of the original mortgage encumbering the Sunrise lots and permitted the foreclosing of said mortgage; continued collecting monies for lots which no longer belonged to the purchasers because they had been foreclosed; received profits from the fraud.

*Jorge Colón Nevarez:* Stockholder, officer and director of Empresas Financieras and Banco de Economías; stockholder of J.C. Investments, Inc.; arranged for financing the down payment for the purchase of the lands which would later constitute the Sunrise properties; filed applications in the Florida Land Sales Board; Approved false and deceptive advertising materials; allowed the offering of streets to be built in the Sunrise Projects; knew that the promotion and offerings being carried out for the sale of the Sunrise projects were false; knew that 35% of Sunrise Acres was marsh or swampy and subject to flooding; knew that 100% of the lots were being sold; allowed the representing to plaintiffs that the Sunrise lots were good and sound investments; allowed the obscuring and down playing the importance of the written warning placed in the contracts; knew that there were lots being sold although they were heavily encumbered; allowed others to circumvent the cease and desist order issued by the Florida Land Sales Board and to continue promoting the sale of the Sunrise lots; established the system of loans through the codefendant Bank in order to finance the purchases of the lots; allowed others to represent Banco de Economías as promoter of the Sunrise lots project; failed to cause payments of the original mortgage encumbering the Sunrise lots to be made and permitted the foreclosing of said mortgage; received profits from the fraud.

*Juan Martínez Echevarría:* Arranged for financing the down payment for the purchase of the lands which would later constitute the Sunrise properties; filed applications in the Florida Land Sales Board; allowed the use of false and deceptive advertising materials; allowed the offering of streets to be built in the Sunrise projects; knew that the promotion and offerings being carried out for the sale of the Sunrise projects were false; knew that 35% of Sunrise Acres was marsh or swampy and subject to

E. The Statute of Limitations.

Finally, defendants argue that the RICO claims are time-barred. The Supreme Court, following the model of the Clayton Act,[20] has established a uniform four-year limitations period for civil RICO plaintiffs. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). However, the Court expressly left open the more difficult question of when a RICO cause of action accrues.

The First Circuit has not addressed the accrual issue in the civil context, although in the criminal sphere the court found a prosecution under section 1962(c) timely if the government proves at least one predicate act occurring within the limitations period. *U.S. v. Torres López,* 851 F.2d 520, 525 (1st Cir.1988). Those circuits that have addressed the accrual issue in civil cases are divided between two basic approaches. The first approach is concerned solely with the time the plaintiff knew or should have known of the injury. *See, e.g., Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2nd Cir.1988). A second, more complex approach also takes into consideration the date of the last predicate act that was part of the pattern. *See, e.g., Keystone Ins. Co. v. Houghton,* 863 F.2d 1125 (3rd Cir.1988).

1. *The Simple Injury Discovery Rule.*

The simple injury discovery rule, adopted by the courts of appeal of five circuits, receives its fullest expression in *Bankers Trust Co. v. Rhoades.* *See also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211 (4th Cir.1987); *Bowling v. Founders Title Co.,* 773 F.2d 1175 (11th Cir.1985), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986); *Compton v. Ide,* 732 F.2d 1429 (9th Cir. 1984); *Alexander v. Perkin Elmer Corp.,* 729 F.2d 576 (8th Cir.1984). In *Rhoades,* the Second Circuit took the general federal rule of accrual in fraud cases and applied it to civil RICO claims. This rule states that the limitation period commences when the plaintiff knew or should have known of the injury. In addition, this rule assumes a separate accrual time for each injury suffered by a given plaintiff, and relief may be sought only for those injuries found to fall within the four-year time period. Finally, "as with all rules of accrual, the standard tolling exceptions apply." *Bankers Trust Co. v. Rhoades,* 859 F.2d at 1105.

In fashioning this standard, the Second Circuit relied on two major sources. First, the court looked to the express language of section 1964(c), noting that there is no standing to sue for damages until an injury has occurred and that "until there is a

flooding; knew that 100% of the lots were being sold; allowed the representing to plaintiffs that the Sunrise lots were good and sound investments; allowed the obscuring and down playing the importance of the written warnings placed in the contracts; knew that there were lots being sold although they were heavily encumbered; allowed others to circumvent the cease and desist order issued by the Florida Land Sales Board and to continue promoting the sale of the Sunrise lots; established the system of loans through the codefendant Bank in order to finance the purchases of the lots; participated in representing Banco de Economías as promoter of the Sunrise lots project; failed to cause payments of the original mortgage encumbering the Sunrise lots to be made and permitted the foreclosing of said mortgage; received profits from the fraud.

*Fermín Contreras:* Arranged for financing the down payment for the purchase of the lands which would later constitute the Sunrise properties; filed applications in the Florida Land Sales Board; allowed the use of false and deceptive advertising materials; allowed the offering of streets to be built in the Sunrise projects; knew that the promotion and offerings being carried out for the sale of the Sunrise Projects were false; knew that 35% of Sunrise Acres was marsh or swampy and subject to flooding; knew that 100% of the lots were being sold; allowed the representing to plaintiffs that the Sunrise lots were good and sound investments; allowed the obscuring and down playing the importance of the written warning placed in the contracts; knew that there were lots being sold although they were heavily encumbered; allowed others to circumvent the cease and desist order issued by the Florida Land Sales Board and to continue promoting the sale of Sunrise lots; established the system of loans through the codefendant Bank in order to finance the purchases of the lots; allowed others to represent Banco de Economías as promoter of the Sunrise lots project; failed to cause payments of the original mortgage encumbering the Sunrise lots to be made and permitted the foreclosing of said mortgage; received profits from the fraud.

20. *See* 15 U.S.C. § 15b.

right to sue under section 1964(c), a civil RICO action cannot be held to have accrued." *Bankers Trust Co. v. Rhoades,* 859 F.2d at 1102. Second, the *Rhoades* court noted that the Supreme Court adopted for RICO the Clayton Act's four-year time period due to certain similarities between the two statutes. Thus, the Second Circuit concluded that "the same statute which lends its four-year period to civil RICO actions should also lend its rule of accrual in determining when the ... period begins to run." *Id.* at 1104.

Applying this rule to the case at hand would require both objective and subjective determinations. The objective question is whether the plaintiffs should have known of their injuries prior to August 2, 1978. We have already held, in our discussion of the two-year securities act time limit, that with the exercise of due diligence all plaintiffs should have discovered the fraud prior to August 2, 1980. However, when 1978 rather than 1980 is the year in question, the record does not support the same conclusion.

This is so largely because the combination of factors crucial to our holding that the securities claims are time-barred had not yet solidified in 1978. The cease and desist order against J.C. Investments was not issued until March of that year, and it may be assumed that the misleading mailings continued at least up until this time. Moreover, J.C. Investments did not file for bankruptcy until 1978. In addition, before this time relatively few plaintiffs had expressed dissatisfaction with their lots, and Florida agencies were not answering inquiries with warnings concerning J.C.'s marketing behavior. Finally, the first negative newspaper article on record is dated after August 2, 1978. Thus, we find a genuine issue of material fact as to whether plaintiffs should have been aware of their injuries prior to this time.

While an objective determination is unwarranted, we nevertheless have no doubt

that some of the plaintiffs in fact knew of their injuries prior to August 2, 1978, and as to these plaintiffs the application of the simple discovery rule would dictate dismissal.[21] However, we will not make individual determinations because we find that the actions of all the civil RICO plaintiffs are saved by the rejection of the simple discovery accrual standard and the adoption of the Third Circuit's rule, as discussed below.

2. *The Third Circuit's Accrual Standard.*

▇ In *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125 (3rd Cir.1988), the Third Circuit held that the limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed, unless, as part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur which are part of the same pattern. In that case, the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same racketeering activity. The last predicate act need not have resulted in the injury to the plaintiff but must be part of the same "pattern." *Id.* at 1126.

In reaching this conclusion, the Third Circuit began by surveying other possible accrual standards, including the simple injury discovery standard adopted by the Second Circuit. The *Hougton* court examined the reasoning behind the Second Circuit's opinion in *Rhoades* and found it flawed. First, the Third Circuit opined that the simple injury discovery rule places too much emphasis on the injury element of a civil RICO cause of action and does not address the pattern element. Thus,

> [u]nder the simple discovery rule if a plaintiff suffers a single injury as a result of a predicate act but the second predicate act which establishes the necessary "pattern" occurs five years after

**21.** As we observed in relation to the securities time limit, due diligence would be triggered as to plaintiffs who indisputably received and read the Florida Public Offering Statements, as well

as those who in fact uncovered a cause for displeasure prior—in the civil RICO context—to August 2, 1978.

the injury to the plaintiff, that plaintiff's claim is barred by the four year civil RICO statute of limitations. Yet the original damage to the plaintiff is not in fact a RICO injury until, at a minimum, the second predicate act establishes the necessary pattern. In such cases the purpose of the statute is defeated by the simple discovery rule.

*Id.* at 1134.[22] *See also County of Cook v. Berger,* 648 F.Supp. 433, 434 (N.D.Ill.1986) (simple discovery rule "confuses the injurious RICO violation, a pattern of illegal conduct, with its civil remedy.")

For similar reasons the Third Circuit declined to adopt the Clayton Act's accrual standard. While conceding that many parallels exist between RICO and the Clayton Act, the *Houghton* court observed that those parallels do not include the elements necessary to plead a cause of action; the Clayton Act has no pattern requirement, and thus the analogy fails. The "uniqueness of the RICO statute with all its prerequisites and the fact that multiple injuries could result from a single pattern of racketeering activity argues against the incorporation of the Clayton Act accrual rule." *Id.* at 1135 (citation and quotation omitted).

Finally, the Third Circuit rejected a rule of separate accrual for each injury in favor of an accrual standard applicable to all injuries inflicted by the same illegal pattern of activity. In so doing, the court found that Congress intended the remedial and policing functions of the civil RICO statute to be directed at multiple victim patterns. *Id.* at 1131–32. The court noted that in requiring the last predicate act forming a pattern to occur with ten years after the commission of a prior predicate act, 18 U.S.C. § 1961(5), Congress

> [m]ust have envisioned causes of action which would involve patterns of racketeering extending over that period of

time. It would be inconsistent with this breadth of definition for us to state that we will look to the past ten years to see if a civil RICO claim exists but if we find ten years of racketeering activity, all related and all perpetrated by the same defendants, we will provide a remedy only to those who were victimized within the past four years. To do so would encroach upon and limit a legislatively-enacted scheme to provide recovery for racketeering injuries. *See* 18 U.S.C. § 1961(5), 1964(c).

Thus, the Third Circuit found that if the last predicate act fell within the four-year time period, then all the plaintiffs' actions were timely provided the injuries arose from the same pattern of illegal activity. *Id.* at 1135.

We find this reasoning persuasive, especially in light of the Congressional mandate that RICO "shall be liberally construed to effectuate its remedial purpose." Organized Crime Control Act, Pub.L. No. 91–452 § 904(a), 84 Stat. 942, 947 (1972). Moreover, this interpretation is consistent with plain language of the statute which takes aim not at isolated events but at a "pattern of racketeering activity." Therefore, we adopt the rule espoused in *Houghton* for this case.

■ Applying the *Houghton* rule, we note that this is a multi-victim, multi-predicate act case, one where "there is further injury to the plaintiff or further predicate acts ... which are part of the same pattern." *Houghton,* 863 F.2d at 1126. Therefore, the accrual period in this case runs "from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity." *Id.*

Starting with the concept of last predicate act, we note that at least one sale constituting an alleged fraud occurred af-

---

**22.** The court in *Houghton* also notes that the simple injury discovery rule has come under scholarly attack. *See* Goldsmith, "Civil RICO Reform: The Basis for Compromise," 71 Minn. L.Rev. 827, 879 (1987) ("Because a potential plaintiff has not been injured under RICO until the pattern element has been satisfied, it is inap-

propriate to start the limitations period before the pattern is fully developed."); J. Moss, "Special Problems of a Civil RICO Case," 181, in *Fourth Annual RICO Litigation Seminar* (1987) (predicting that the Supreme Court might reject the simple discovery rule in favor of the last predicate act rule).

ter August 2, 1978.[23] Therefore, at least one of the alleged predicate acts occurred within the limitations period.

In addition, we note questions of fact as to whether many of the plaintiffs "knew or should have known" of their last injury by August 2, 1978. Taking "last injury" to mean the installment payments plaintiffs made that were induced by misleading statements, we find that many such payments were made into the 1980's. Moreover, even if we read "last injury" to refer exclusively to the signing of the contracts, we cannot, as discussed above, rule as a matter of law that all plaintiffs should have discovered the same prior to four years before this action was filed.

Finally, this is a case where all the plaintiffs were allegedly victimized by the same defendants and the same pattern of racketeering activity. Therefore, because we find that some of the "last injuries" as well as the "last predicate acts" fall within the four-year time period, we also, pursuant to the doctrine in *Houghton,* recognize as timely all of the injuries constituting part of the same illegal pattern of behavior. As such, summary judgment in favor of defendants on the civil RICO claims must be DENIED.

### IV. *Interlocutory Appeal*

In this opinion the court has addressed several questions of law in the face of substantial grounds for a difference of opinion. In particular, many of the questions regarding civil RICO are ripe for decision in the First Circuit. It is this court's view that an immediate appeal on these issues may materially advance the ultimate termination of the litigation, thus warranting the certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *In re San Juan Dupont Plaza Hotel Fire Litigation,* 859 F.2d 1007 (1st Cir.1988).

At the same time, the court is mindful that this is an old, protracted litigation, reassigned to this judge in 1986. In preparing this order and bringing this litigation to its present posture, the court has spent an untold number of work hours

sifting through the voluminous docket in this case, as well as in examining literally thousands of pages of exhibits, deposition testimony and statements of fact. In doing so, the court has gained a familiarity with this case that is indispensable for proper adjudication, yet, at the same time, due to the running of time and a turnover in court personnel, in jeopardy of being lost if a trial on the merits is long delayed. Therefore, while we reiterate our belief that an interlocutory appeal on certain issues will accelerate the termination of this complex litigation, we nonetheless urge that any issue accepted by the Court of Appeals for decision be handled on an expedited basis. However, **a protective trial date of May 1, 1990 is now set.**

With these considerations in mind, we grant certification to the parties to petition the Court of Appeals to consider any of the following questions of law:

1. Whether, with respect to actions brought for a violation of section 1404(a)(2) of the Land Sales Act, the word "sale" in section 1711 (prior to amendment) refers to the date of the purchase contract or the passing of title.

2. Whether, in a civil RICO action to recover for a violation of section 1962(a), a plaintiff must plead an injury arising from the use or investment of racketeering profits.

3. Whether, in a civil RICO action to recover for a violation of section 1962(c), a cause of action has been stated when the "enterprise" consists of an association in fact of various defendants, each of whom are also "persons" within the meaning of that section.

4. Whether liability under civil RICO for a violation of section 1962(c) may arise from the aiding and abetting of two or more predicate acts.

5. When does a civil RICO cause of action accrue for statute of limitation purposes?

---

**23.** Plaintiffs Eusebio Alfonso Reyes and Rosa Celenia Rivera González executed a purchase *agreement with J.C. Investment on January 2, 1979.*

The parties are reminded that an application for interlocutory appeal must be made within ten days after the entry of this order.

## V. *Conclusion*

Here is where this litigation now stands:

1. The Land Sales Act claims of all plaintiffs are time-barred and summary judgment on the same is GRANTED to defendants accordingly.

2. The Securities Act claims of all plaintiffs are also time-barred, and summary judgment on these claims is GRANTED in favor of defendants.

3. Summary judgment is also GRANTED in favor of defendants on the civil RICO claims for violation of section 1962(a). However, summary judgment is DENIED on the civil RICO claims for violation of section 1962(c).

4. The court certifies an interlocutory appeal on the questions outlined in section IV of this opinion. The application for appeal must be made within ten (10) days of this order. Should any of the parties decide to seek an interlocutory appeal within this time, the setting of a pretrial conference date will be delayed pending a determination by the Court of Appeals.

IT IS SO ORDERED.